38 F.3d 945
 18 Employee Benefits Cas. 2188
 Fred G. JENSEN; James J. Monahan; Richard F. Kriegler;
Walter C. Clark, on behalf of themselves and all
others similarly situated, Plaintiffs-Appellees,
v.
SIPCO, INC.; Monfort, Inc., Defendants-Appellants.
 No. 93-3223.
 United States Court of Appeals,
Eighth Circuit.
 Submitted April 13, 1994.
Decided Oct. 13, 1994.
Rehearing and Suggestion for Rehearing En Banc Denied Nov. 18, 1994.
 
 Sylvia Davidow, Houston, TX, argued for appellant (William Bruckner and Charles Sykes on the brief).
 James Hanks, Sioux City, IA, argued for appellee (P.L. Nymann, and Steven Kohl, Sioux City, IA, on the brief).
 Before LOKEN, Circuit Judge, FRIEDMAN* and JOHN R. GIBSON, Senior Circuit Judges.
 LOKEN, Circuit Judge.
 
 
 1
 This is a class action on behalf of eight hundred persons who retired from salaried positions at SIPCO, Inc. ("SIPCO"), on or before March 1, 1989. The Class claims that it is entitled to vested medical benefits under two Medical Benefit Plans for Salaried Pensioners adopted by SIPCO in the early 1980s. The district court[1] agreed and ordered SIPCO and its sister company, Monfort, Inc. ("Monfort"), to provide those benefits. SIPCO and Monfort appeal. The governing law is the Employee Retirement Income Security Act, 29 U.S.C. Secs. 1001 et seq. ("ERISA"). We conclude that SIPCO intended that its retiree medical benefits would vest when salaried employees retired. We therefore affirm.I.
 
 
 2
 In April 1981, Esmark, Inc., a holding company, spun off the fresh meat operations of Swift & Company ("Swift") to public shareholders. The new company became SIPCO. SIPCO immediately established Plan 1006, the Medical Benefit Plan for Salaried Pensioners. It covered salaried employees who retired from Swift or SIPCO after January 1, 1979 and were eligible for vested SIPCO pension benefits. SIPCO also established a Medical Benefit for Pensioners Trust to fund future retiree medical benefit payments under Plan 1006. Esmark contributed $6,200,000 to the Trust.
 
 
 3
 On January 1, 1984, due to increasing costs under Plan 1006, SIPCO created Plan 1017, which provided reduced medical benefits to salaried employees retiring after that date. Plan 1017 had a more restrictive eligibility requirement than Plan 1006--twenty years service with Swift and SIPCO, instead of ten years. Those who had retired before 1984 continued receiving full Plan 1006 benefits.
 
 
 4
 In early 1986, SIPCO was acquired by an investment firm, CHS Holding II, Inc. In the merger agreement, CHS agreed to continue SIPCO's medical benefits plans for salaried pensioners for three years after the closing "on the same basis as presently in effect." In 1987, ConAgra, Inc., which owned Monfort, purchased a fifty percent interest in SIPCO. Monfort began administering SIPCO's pension plans and retiree medical plans in 1987. ConAgra acquired complete ownership of SIPCO in August 1988 and consolidated the two meat packing organizations under Monfort's management.
 
 
 5
 In an August 10, 1988 memorandum to management employees, the President of Monfort advised: "We will abolish the Sipco retiree health care plan for those who have not retired prior to February 27 [later extended to March 1], 1989." In January 1989, SIPCO retirees received new Summary Plan Descriptions ("SPDs")[2] for Plans 1006 and 1017, which included an unsettling new disclosure:
 
 
 6
 Keep in mind that the plan and trust documents are the controlling legal documents and you should rely solely on these provisions of the plan and the trust documents.
 
 
 7
 SIPCO, Inc. reserves the right to terminate, discontinue, alter, modify, or change this plan or any provision of this plan at any time.
 
 
 8
 In April 1989, after the March 1 deadline for retiring with medical benefits, eligible retirees received an SPD for a new plan, Plan 1018, covering salaried employees who retired between January 1 and March 1, 1989. This SPD disclosed benefits changes from Plan 1017 and included the statement, "employer reserves the right to charge the employee/retiree a premium for this coverage...."
 
 
 9
 A number of retirees protested these changes in the SPDs. When SIPCO did not respond, four retirees commenced this action against SIPCO and Monfort on behalf of the Class, seeking an injunction requiring defendants to provide the retiree medical benefits detailed in Plan 1006 and Plan 1017 "for life." In the district court (and on appeal), SIPCO defended on the ground that each formal Plan document includes an unambiguous reservation of the right to unilaterally amend or terminate retiree medical benefits. For example, Plan 1006 provides:
 
 ARTICLE XVI
 POWER OF AMENDMENT
 
 10
 1. The Board of Directors of the Company shall have the right and power to alter, amend, or annul any of the provisions of this Pensioner Medical Plan, provided, however, that no such alteration, amendment or annulment shall permit any part of the Trust Fund, either corpus or income, to be used for or to be diverted to purposes other than for the exclusive benefit of the Employees or Participants or their beneficiaries.
 
 
 11
 2. An amendment shall become effective as of the date specified in the resolution adopting such amendment. Unless otherwise expressly provided therein, amendments shall not be applicable to persons who are receiving pensions hereunder prior to the effective date of such amendment.
 
 
 12
 Plan 1017 contains nearly identical language, and the Medical Benefit for Pensioners Trust contains provisions explicitly recognizing that the Plans it was created to fund may be modified or even terminated. Given these express Plan provisions, SIPCO argues, the Class has no right to vested retiree medical benefits.
 
 
 13
 Plaintiffs argue that the reservation-of-rights provisions in the Plans may not be given effect because the SPDs provided to employees and retirees prior to 1989 did not disclose that SIPCO may amend or terminate retiree medical benefits. The SPD for Plan 1017, for example, disclosed only the following regarding benefits termination:
 
 TERMINATION OF COVERAGE
 
 14
 Children Who Marry or Reach Age 19--
 
 
 15
 All coverage for children ceases on date of marriage or age 19, whichever occurs first.
 
 
 16
 Divorce of Spouse--
 
 
 17
 All coverage for the spouse ceases on the date of divorce.
 
 
 18
 Death of Pensioner--
 
 
 19
 Coverage for dependents continues for a period of 90 days following date of death and then ceases unless the spouse is to receive a survivors pension.
 
 
 20
 After a three day bench trial, the district court entered judgment in favor of the Class. It held (i) "that it was SIPCO's intention at pertinent times to provide each of plaintiffs' class members with lifetime benefits"; (ii) that SIPCO's failure to disclose its contrary reservation of rights in the pre-1989 SPDs was a material misrepresentation that equitably estops SIPCO from later exercising those rights; and (iii) that this failure to disclose was also a breach of defendants' fiduciary duties under ERISA. The court ordered that Class members who retired before 1984 receive the lifetime medical benefits described in the initial SPD for Plan 1006, and Class members who retired between January 1, 1984, and March 1, 1989, receive the lifetime benefits described in the initial SPD for Plan 1017 (thus invalidating Plan 1018). SIPCO and Monfort appeal.
 
 II.
 
 21
 The core issue in this case is whether, when each Class member retired, his or her SIPCO retirement medical benefits were vested. ERISA requires that employee pension plans meet minimum vesting standards. See 29 U.S.C. Sec. 1053. But vesting is not mandatory for "employee welfare benefit plans"--plans that offer benefits such as the medical benefits here at issue. See 29 U.S.C. Secs. 1002(1), 1051(1). Therefore, an employer may unilaterally modify or terminate medical benefits at any time "absent the employer's contractual agreement to the contrary." Howe v. Varity Corp., 896 F.2d 1107, 1109 (8th Cir.1990); see also Meester v. IASD Health Servs. Corp., 963 F.2d 194, 197 (8th Cir.1992). Thus, the question is whether Plan 1006 and Plan 1017 conferred vested benefits on class members who retired under those Plans. Plaintiffs have the burden of proof on that issue. See Anderson v. Alpha Portland Indus., Inc., 836 F.2d 1512, 1516-17 (8th Cir.1988), cert. denied, 489 U.S. 1051, 109 S.Ct. 1310, 103 L.Ed.2d 579 (1989).
 
 
 22
 Because employee benefit plans must be established by a "written instrument," 29 U.S.C. Sec. 1102(a)(1), any SIPCO promise to provide vested benefits must be "incorporated, in some fashion, into the formal written ERISA plan." United Paperworkers Int'l Union v. Jefferson Smurfit Corp., 961 F.2d 1384, 1386 (8th Cir.1992). Therefore, our inquiry must begin with the written plan documents. SPDs are considered part of the ERISA plan documents. See Alday v. Container Corp. of America, 906 F.2d 660, 665 (11th Cir.1990), cert. denied, 498 U.S. 1026, 111 S.Ct. 675, 112 L.Ed.2d 668 (1991); Moore v. Metropolitan Life Ins. Co., 856 F.2d 488, 492 (2d Cir.1988).
 
 
 23
 When interpreting ERISA plan documents, the Supreme Court has referred us to, and explicated, the law of trusts:
 
 
 24
 The terms of trusts created by written instruments are "determined by the provisions of the instrument as interpreted in light of all the circumstances and such other evidence of the intention of the settlor with respect to the trust as is not inadmissible."
 
 
 25
 Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 112, 109 S.Ct. 948, 955, 103 L.Ed.2d 80 (1989), quoting Restatement (Second) of Trusts Sec. 4 cmt. d (1959). The question of what "other evidence" is admissible turns on the relative ambiguity of the plan provision being construed:
 
 
 26
 That intent [of the settlor] is first sought by careful examination of the trust clause in question, giving the words in that clause their ordinary meanings. If the construction question cannot be resolved by reference to the clause alone, the court will examine the entire trust instrument to determine the creator's intent and purposes.... The third step becomes necessary when the intent or meaning of the settlor ... cannot be determined by reference to the provisions of the trust instrument itself. Extrinsic evidence will be admitted by the court to assist it in determining the meaning and effect of the particular clause.
 
 
 27
 George G. Bogert, The Law of Trusts & Trustees Sec. 182 (rev. 2d ed. 1979 & Supp.1993) (footnotes omitted). See also Landro v. Glendenning Motorways, Inc., 625 F.2d 1344, 1353 (8th Cir.1980).
 
 
 28
 In this case, plaintiffs argue that the "TERMINATION OF COVERAGE" provisions in the Plan SPDs promised vested benefits when they stated that benefits will be provided until the retiree dies, or a spouse divorces, or a child marries or reaches age 19. We have previously noted that this type of provision supports an argument that retiree benefits are vested. See Local Union No. 150-A, United Food & Commercial Workers Int'l Union v. Dubuque Packing Co., 756 F.2d 66, 69-70 (8th Cir.1985). However, these termination-of-coverage clauses are at most an ambiguous expression of an intent to vest retiree benefits; they can also be construed as dealing only with termination of coverage on an individual basis, not the separate questions of whether the Plan may be terminated or its benefit levels modified by SIPCO.
 
 
 29
 SIPCO relies exclusively on the Plan provisions permitting it to amend or terminate "any of the provisions of this Pensioner Medical Plan." SIPCO argues that this is an unambiguous declaration that retiree benefits are not vested. We agree that a reservation-of-rights provision is inconsistent with, and in most cases would defeat, a claim of vested benefits. See Jefferson Smurfit, 961 F.2d at 1385. But the question at this stage of the analysis is whether these provisions are so unambiguous as to make unnecessary any reference to other Plan provisions and extrinsic evidence. We think not. In the first place, the reservation-of-rights provisions are not facially unambiguous--they leave at least some doubt as to whether SIPCO intended to reserve the right to change or terminate benefits to already retired pensioners, or only the right to make prospective changes for those covered by the Plan but not yet retired. In the second place, "[t]he power to modify [a trust] may be relinquished by the settlor." Bogert, The Law of Trusts & Trustees Sec. 993, at p. 232. Whether a power has been relinquished obviously requires examination of extrinsic evidence, which the district court properly undertook.
 
 
 30
 When we look at the record beyond the reservation-of-rights provisions themselves, we find that SIPCO has nothing to offer. It did not include complete copies of Plan 1006 or Plan 1017 in the record on appeal, so we cannot study the entire document for evidence of the settlor's intent. And SIPCO presented virtually no extrinsic evidence at trial supporting its position. This is perhaps not surprising since the present SIPCO, managed by ConAgra and Monfort, is a very different organization than the SIPCO that created Plan 1006 and Plan 1017.
 
 
 31
 Plaintiffs, on the other hand, presented a wealth of extrinsic evidence supporting their contention that SIPCO intended that Plan 1006 and Plan 1017 medical benefits would vest when a Class member retired under either Plan. This largely undisputed evidence included:
 
 
 32
 1. In the 1970's, Swift provided vested retirement medical benefits to its salaried employees, benefits intended to be equal to or better than those provided to hourly employees under Swift's collective bargaining agreements. SIPCO intended to continue Swift's policy, and Esmark funded the Medical Benefit for Pensioners Trust to support that effort.
 
 
 33
 2. As the Plan names suggest, Plan 1006 and Plan 1017 were closely related to SIPCO's vested pension plans. Eligibility requirements were the same. Beth Elkin, SIPCO's Manager of Employee Benefits in the early 1980s, testified that, when employees asked her whether to choose a smaller "joint and survivor annuity" under the pension plan, "I would always point out to them that ... it also provided lifetime medical benefits which could be in fact more valuable than the actual pension check."
 
 
 34
 3. Prior to March 1, 1989, all the changes SIPCO unilaterally made to its retiree benefits--most notably, the adoption of Plan 1017--were prospective only. Beth Elkin testified that Plan 1017 was announced in advance "[t]o give people who were eligible for a pension a chance to decide whether they wanted to retire under the old medical benefits or if they wanted to continue working and retire under the new benefits." This policy of not changing the benefits of prior retirees is consistent with the concept of vested benefits. See Allied Chemical & Alkali Workers v. Pittsburgh Plate Glass Co., 404 U.S. 157, 181 n. 20, 92 S.Ct. 383, 398 n. 20, 30 L.Ed.2d 341 (1971) ("[V]ested retirement rights may not be altered without the pensioner's consent.").
 
 
 35
 4. John Copeland began working for Swift in 1948 and became President and Chief Executive Officer of SIPCO when it was formed in 1981. Copeland testified that Swift provided vested medical benefits to salaried pensioners and that SIPCO intended to continue that policy when it adopted Plan 1006 and Plan 1017. Copeland was familiar with the SPDs for those Plans and knew they did not disclose a reservation of rights because "it wasn't our policy." He explained that Esmark contributed to the Pensioners Trust "for those people that were on entitlement rolls [already retired] and those that were presently being transferred to our corporation." Copeland negotiated the merger with CHS. He pressed for the provision that CHS would not change the retirement medical plan for three years because "I was concerned that they would move the corporate headquarters, close other units and retire a lot of people and before they would do that they would change our retirement plan and our people would be subjected to much less benefits than they had anticipated."
 
 
 36
 5. SIPCO's former Regional Employee Relations Manager, who began working for Swift in 1951, testified that SIPCO continued Swift's policy concerning retirement medical benefits for salaried employees. It was part of this manager's responsibilities to communicate that policy to SIPCO salaried employees. He considered lifetime retirement medical benefits an "earned benefit" for any employee who was eligible for benefits under the Plan in effect when he or she retired. "[I]f they were eligible for a pension," he explained, "they would be entitled to pensioner's health insurance for the rest of their life."
 
 
 37
 6. Benefits manager Beth Elkin testified that she helped prepare the pre-1989 SPDs. She was aware that other companies had been sued because they inserted reservation-of-rights provisions in their SPDs. SIPCO intentionally declined to put such a disclosure in its SPDs for Plan 1006 and Plan 1017. "We were all aware of it. It did not apply to us, and we did not include the language."
 
 
 38
 7. In July 1988, an outside actuarial consulting firm opined that it would be "very difficult, if not impossible, for SIPCO to unilaterally reduce benefits" for those who had previously retired.
 
 
 39
 Given this overwhelming extrinsic evidence, we agree with the district court that SIPCO in creating Plan 1006 and Plan 1017 intended that retirement medical benefits for salaried employees would vest when those employees retired. To put the issue in trust law terms, either the reservation-of-rights provisions in the plan documents must be construed as conferring only a power to modify plan benefits prospectively (that is, for salaried employees not yet retired),[3] or SIPCO relinquished the broader power to modify benefits for those already retired. In most ERISA welfare benefit plans, a reservation-of-rights provision would reflect the employer's intent to make plan benefits non-vested. But here the provisions are not free of ambiguity, and plaintiffs have proved that SIPCO, in creating the Plans, did not have that intent.
 
 III.
 
 40
 As may be apparent from the foregoing discussion, we disagree with the emphasis that plaintiffs and the district court placed on SIPCO's pre-1989 SPDs. Adequate disclosure to employees is one of ERISA's major purposes. Recognizing that employee benefit plans are usually lengthy and highly technical documents, Congress required plan administrators to furnish SPDs to each plan participant and beneficiary. See 29 U.S.C. Sec. 1022(a)(1). Congress also stated very specifically what an SPD must contain:
 
 
 41
 (b) The plan description and summary plan description shall contain the following information: ... a description of the provisions providing for nonforfeitable pension benefits; circumstances which may result in disqualification, ineligibility, or denial or loss of benefits....
 
 
 42
 29 U.S.C. Sec. 1022(b). In other words, a pension plan SPD must disclose its vesting terms, but a welfare plan SPD is not required to disclose that plan benefits are not vested. Rather, Sec. 1022(b) only expressly requires that a welfare plan SPD specify those circumstances in which an individual beneficiary is not entitled to benefits otherwise provided by the present terms of the plan. See Wise v. El Paso Natural Gas Co., 986 F.2d 929, 935 (5th Cir.) ("Section 1022(b) relates to an individual employee's eligibility under then existing, current terms of the Plan and not to the possibility that those terms might later be changed, as ERISA undeniably permits."), cert. denied, --- U.S. ----, 114 S.Ct. 196, 126 L.Ed.2d 154 (1993). The "TERMINATION OF COVERAGE" provisions of SIPCO's pre-1989 SPDs contained this limited type of Sec. 1022(b) disclosure.
 
 
 43
 The Department of Labor, which is responsible for interpreting and enforcing ERISA, has promulgated detailed regulations specifying the disclosure requirements for SPDs. See 29 C.F.R. Secs. 2520.102-1 to -5, .104b-1 to -4. Nowhere do these regulations require that a welfare plan SPD specifically disclose that its benefits are not vested. That these benefits need not be vested was one of the most important legislative decisions reflected in ERISA. Given the importance of this issue and the Department's thorough approach to questions of disclosure, its failure to require SPDs to disclose non-vesting cannot be an inadvertent omission. Therefore, giving appropriate deference to the Department's interpretation of Sec. 1022(b), we conclude that the failure to disclose that a welfare plan's benefits are not vested is neither a material misrepresentation nor a breach of the plan administrator's fiduciary duties. Accord Wise, 986 F.2d at 936-38.
 
 
 44
 Plaintiffs argue that the silence of the SIPCO SPDs on the question of vesting overrides any specific plan provisions stating that SIPCO reserved the right to amend or terminate benefits. Because of the importance of disclosure to the statutory regime, an SPD provision prevails if it conflicts with a provision of a plan. See, e.g., Aiken v. Policy Management Sys. Corp., 13 F.3d 138, 140-41 (4th Cir.1993). However, this rule of construction does not apply when the plan document is specific and the SPD is silent on a particular matter. "While clear and unambiguous statements in the summary plan description are binding, the same is not true of silence." Wise, 986 F.2d at 938.
 
 
 45
 This does not mean that the silence of SIPCO's pre-1989 SPDs on the question of vesting is irrelevant in construing the Plans. As our prior discussion makes clear, those SPDs were a significant factor in discerning SIPCO's intent regarding the issue of vesting. However, the SPDs are simply part of that interpretive landscape. We do not affirm the district court's material misrepresentation and breach of fiduciary duty holdings.
 
 
 46
 Nor do we agree with the district court's equitable estoppel conclusion. Plaintiffs argue that communications and promises made by SIPCO and Monfort to employees may be the basis for invoking equitable estoppel. Although we have left open the question whether equitable estoppel will ever give rise to an ERISA claim, we have held that an ERISA plaintiff may not use equitable estoppel to recover money damages for reliance on an "extra-contractual promise." Slice v. Sons of Norway, 34 F.3d 630, 632 (8th Cir.1994).[4] This would appear to bar plaintiffs' equitable estoppel claims for additional benefits.
 
 
 47
 Moreover, even assuming that the doctrine applies, courts recognizing estoppel in ERISA cases require proof of a material misrepresentation on which the participant or beneficiary has reasonably relied to his detriment. See Black v. TIC Inv. Corp., 900 F.2d 112, 115 (7th Cir.1990). Most courts have held that ERISA precludes oral or informal amendments to a plan, by estoppel or otherwise. See National Cos. Health Benefit Plan v. St. Joseph's Hosp., 929 F.2d 1558, 1572 & n. 13 (11th Cir.1991); Hozier v. Midwest Fasteners, Inc., 908 F.2d 1155, 1163-64 (3d Cir.1990); Moore, 856 F.2d at 492. See also Anderson v. John Morrell & Co., 830 F.2d 872, 877 (8th Cir.1987). SIPCO's pre-1989 SPDs may not be the basis for an estoppel--they were merely silent with regard to SIPCO's reservation of the right to modify or terminate benefits, and they expressly notified interested participants and beneficiaries that they could obtain and examine all Plan documents, as required by the Department's regulations. See 29 C.F.R. Sec. 2520.102-3(t)(2). At a minimum, these considerations demonstrate that, if estoppel is an available doctrine, it must be applied with factual precision and therefore is not a suitable basis for class-wide relief. See Cooke v. Manufactured Homes, Inc., 998 F.2d 1256, 1261 n. 5 (4th Cir.1993); Anderson v. Alpha Portland Industries, 836 F.2d at 1520.
 
 
 48
 The district court correctly concluded that SIPCO intended to and did provide the plaintiff Class with vested retiree medical benefits. Accordingly, its judgment is affirmed.
 
 
 
 *
 The HONORABLE DANIEL M. FRIEDMAN, Senior United States Circuit Judge for the Federal Circuit, sitting by designation
 
 
 [1]
 The HONORABLE DONALD E. O'BRIEN, Senior United States District Judge for the Northern District of Iowa
 
 
 [2]
 ERISA provides that SPDs "shall be furnished to participants and beneficiaries." SPDs "shall include the information described in subsection (b) of this section, shall be written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." 29 U.S.C. Sec. 1022(a)(1)
 
 
 [3]
 The extent of a power to modify a trust depends upon the terms of the trust and therefore the intent of the settlor. See IV William F. Fratcher, Scott on Trusts Sec. 331, at p. 382 (4th ed. 1989)
 
 
 [4]
 See also McGee v. Funderburg, 17 F.3d 1122, 1126 (8th Cir.1994); Farley v. Benefit Trust Life Ins. Co., 979 F.2d 653, 659-60 (8th Cir.1992); Landro, 625 F.2d at 1352, 1355 (pre-ERISA case applying Minnesota law). Nor may equitable estoppel be applied so as to jeopardize the soundness of a funded ERISA plan. See Phillips v. Kennedy, 542 F.2d 52, 55 n. 8 (8th Cir.1976)