# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-3865/07-3867

_____

| | | |
|---|---|---|
| Heather Halbach, as personal representative of the estate of John Lewis, and on behalf of a class of long-term disability recipients denied benefits under defendants' health insurance plans; Barbara Schield, on behalf of a class of long-term disability recipients denied benefits under defendants' medical, dental, vision, prescription drug, and life insurance plans, | * * * * * * * * * * * * | |
| Appellees/Cross-Appellants, | * * | Appeal from the United States District Court for the Eastern |
| v. | * * | District of Missouri. |
| Great-West Life & Annuity Insurance Company; Great-West Life & Annuity Insurance Company Employee Welfare Benefit Plan; Great-West Life & Annuity Company Employee Health & Welfare Plan; Great-West Life & Annuity Insurance Company Flexible Benefits Plan; Great-West Life Staff & Agents' Plan, | * * * * * * * * * * | |
| Appellants/Cross-Appellees. | * | |

_____

Submitted: October 16, 2008
Filed: April 13, 2009

_____

Before GRUENDER, BEAM and SHEPHERD, Circuit Judges.
_____

BEAM, Circuit Judge.

Great-West Life & Annuity Insurance Company appeals from the district court's grant of summary judgment reinstating benefits in favor of a class of disabled employee claimants ("Plaintiffs") receiving long-term disability benefits under an employee benefit plan provided by the company (the Plan). Plaintiffs cross-appeal, challenging the relief, or lack thereof, awarded them by the district court. Although we find that Great-West properly amended its Plan and gave the requisite notice, there remains a genuine issue of material fact as to whether the welfare benefits at issue were previously vested. Accordingly, we reverse the district court and remand that issue for trial. We affirm the district court's determination regarding the issue raised in Plaintiffs' cross-appeal–the dismissal of Plaintiffs' request for damages in the nature of certain past-due benefits and COBRA "overpayments."

## I.    BACKGROUND

Generally speaking, until December 31, 2004, Great-West provided a package of medical coverages to former employees receiving long-term disability benefits on the same terms as the medical coverages offered active employees. The Plan was an "employee welfare benefit plan" for purposes of the Employee Retirement Income Security Act of 1974 (ERISA). 29 U.S.C. § 1002(1). The menu of medical coverage includes health, vision, dental, and prescription drug benefits, and life insurance coverage.

Article V of the Plan provides:

> 5.1    Amendment of Plan. The Company reserves the right at any time or times to amend the provisions of the Plan to any extent and in

any manner that it may deem advisable, by a written instrument signed by an officer of the Company; provided, however, that no such modification shall divest a Participant of benefits under the Plan to which he has become entitled prior to the effective date of the amendment.

5.2     Termination of Plan. The Company has established the Plan with the bona fide intention and expectation that it will be continued indefinitely, but the Company has no obligation whatsoever to maintain the Plan in whole or in part for any given length of time and may terminate the Plan in whole or in part by a written instrument signed by an officer of the Company at any time without liability; provided, however, that such termination shall not divest a Participant of benefits under the Plan to which he has become entitled.

We will refer to these sections as the reservation-of-rights clause. This procedure complies with ERISA, which requires that all plans have a procedure for amending the plan, and for identifying the persons who have the authority to amend the plan. 29 U.S.C. § 1102(b)(3).

In late 2004, Great-West decided to cease providing medical coverage to long-term disability claimants. Great-West mailed all Plan participants a letter advising them of the changes that would become effective January 1, 2005. Great-West relies upon this letter as the actual Plan amendment, as it is the only document announcing the amendment that is signed by an officer of the company. The letter stated that effective December 31, 2004, "medical benefits will no longer be continued for current or future Long Term Disability claimants." Further, the letter stated that "[d]ue to the change in the 2005 benefit package, your health coverage will terminate December 31, 2004, and you will be offered the option to elect coverage under COBRA." The letter did not clearly elucidate that the health, vision, dental and prescription drug benefits would be eliminated, but it did enclose and reference "a summary of all plan changes, decision-making tools, health plan overviews and a

health care resource guide."  The enclosed summary plan document (SPD) was entitled "Great-West Summary of Benefit Plan Changes 2005."

Plaintiffs sued Great-West alleging that its Plan amendment and denial of benefits violated the Plan and ERISA.  On cross motions for summary judgment, the district court ruled in Plaintiffs' favor.  The court determined that Great-West's letter along with the enclosed SPD did not validly amend the Plan because even though the letter was signed by an officer, the SPD was not.  Nor, according to the court, was it properly incorporated within the amendment, and thus did not satisfy the written instrument requirement of the Plan.  Then, looking at the letter in isolation, the court held that the letter failed to enumerate the benefits that were being eliminated and failed to notify the Plan participants of the specific changes to the Plan documents.

As to whether Plaintiffs had vested rights to welfare benefits for the length of their disability, the court, applied a de novo standard of review.  It also permitted the use of extrinsic evidence because it determined that the Plan's language was ambiguous as to vesting.  The court then determined that the benefits were vested. The district court granted summary judgment in Plaintiffs' favor and ordered that their medical coverage be reinstated.  Great-West appeals.

## II.    DISCUSSION

### A.    Standard of Review

We review the decision to grant summary judgment de novo and will affirm if, viewing the evidence in the light most favorable to the nonmoving party, we conclude there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Sanders v. City of Minneapolis, 474 F.3d 523, 526 (8th Cir. 2007).  In our review, however, "we apply the same standard as the District Court, which brings us to the first issue we must address: what standard do we, the federal courts, apply in reviewing this particular" decision?  Hillstrom v. Kenefick, 484 F.3d

-4-

519, 524 (8th Cir. 2007). "We review de novo the District Court's determination of the appropriate standard." Id.

The usually cursory exercise of articulating a standard of review is complicated in this case because there are varying standards applicable to the different issues presented. We address each in turn. First, we review the process used in carrying out the Plan amendment, that is, the way Great-West communicated the amendment to Plaintiffs. Second, we examine Great-West's articulated amendment and analyze whether it seeks to eliminate already vested benefits. And finally, we address the remedies claimed in the Plaintiffs' cross-appeal.

## B.      Carrying Out the Plan Amendment

The parties disagree about what standard of review to apply. Great-West claims that because the Plan gave the plan administrator discretion to interpret the Plan, the validity of the amendment is subject to an abuse of discretion standard. Great-West focuses on the communication of the amendment to Plan participants, or the *process* of amendment. Plaintiffs respond that the overall decision to amend the Plan in the first place was a task undertaken by Great-West as plan sponsor and thus is subject to a de novo standard, focusing on the *decision* to amend the Plan. The fact that the parties approach the standard of review question from different angles confounds the issue only slightly. In the end, both parties make valid arguments. Great-West acted as plan sponsor when it sought to amend the Plan, but carried out its duties as plan administrator in communicating that decision to Plaintiffs. At the bottom line, though, the fighting issue between the parties is whether Great-West "validly amended" the Plan. Here, we easily reach this bottom line without necessarily deciding the dispute regarding the appropriate standard of review to apply. Under either standard, we hold that Great West validly amended the Plan.

The sole issue here is whether Great-West validly complied with its Plan amendment requirements by mailing a letter to Plan participants that enclosed and referenced the SPD brochure. This act must constitute "a written instrument signed by an officer of the Company" as the Plan requires for amendments. There is no dispute of material fact as to how Great-West communicated the amendment, only whether the process satisfies the Plan requirement, and thus ERISA.

The district court, without citation to legal authority, first discussed whether the SPD, standing alone, constituted a valid Plan amendment. Because the SPD was not signed by an officer of the company, the district court held it did not. Next, the district court held that the letter's reference to the SPD was insufficient to incorporate the SPD into the Plan amendment. The district court then turned to the letter itself. The court specifically reviewed the letter and discussed only one statement in it that stated "medical benefits will no longer be continued for current or future Long Term Disability claimants." The court analyzed whether the term "medical" was sufficient to encompass all welfare benefits terminated, including health, dental, vision, and prescription drug benefits. The district court held this language failed to enumerate the benefits being eliminated and failed to notify the Plan participants of the specific changes to the Plan documents. As such, the court held that the amendment was ineffectively communicated and therefore not binding upon Plaintiffs.

We disagree with the district court's ultimate conclusion here. First, we note that it could be argued that the letter itself complies with the amendment procedure established in section 5.1, without any reference to the SPD at all. The letter, signed by an officer of the company, states that "[d]ue to the change in the 2005 benefit package, your health coverage will terminate December 31, 2004." The ordinary meaning of "health coverage" encompasses the health, vision, dental and prescription drug benefits, and life insurance coverage that Great-West sought to eliminate. Great-West, however, focuses its argument on whether the letter plus the attached SPD complies with the Plan requirements. It claims that the letter plus the attached SPD,

which does enumerate that "[a]ll medical, dental and vision coverage you are currently enrolled in will terminate December 31, 2004," more than satisfies the Plan's written instrument requirement. Principles of contract law guide our analysis because the signed letter must validly incorporate the unsigned SPD in order to satisfy the Plan requirements.

In the first paragraph, Great-West's letter informs that "medical benefits will no longer be continued for current or future Long Term Disability claimants." In a separate, single-sentence paragraph, the letter also states: "Enclosed is a summary of all plan changes, decision-making tools, health plan overviews and a health care resource guide." The letter then reiterates that "[d]ue to the change in the 2005 benefit package, your health coverage will terminate December 31, 2004." The enclosed SPD was entitled "Summary of Benefit Plan Changes 2005." Page two of the SPD specifically states that "[a]ll medical, dental and vision coverage you are currently enrolled in will terminate December 31, 2004."

Basic contract principles instruct that "[w]here a writing refers to another document, that other document, or the portion to which reference is made, becomes constructively a part of the writing, and in that respect the two form a single instrument. The incorporated matter is to be interpreted as part of the writing." 11 Richard A. Lord, Williston on Contracts § 30:25 (4th ed. 1999). And, in a similar context, this court has applied this principle and acknowledged that a writing may incorporate another document if the terms of the incorporated document are known or easily available to the contracting parties. Marolt v. Alliant Techsystems, Inc., 146 F.3d 617, 621 (8th Cir. 1998). Here, the SPD was easily available. It was attached to the letter and in the same mailing. The letter's reference to the SPD, then, was sufficient as a legal matter to incorporate the attached SPD. Reviewing these two documents in harmony, as Great-West requests, we find that Great-West validly amended the Plan by way of a written instrument signed by an officer of the company

as the Plan requires. Accordingly, we reverse the district court's decision on this issue.

## C.    Vesting

Plaintiffs claim that the welfare benefits at issue were vested at the time Great-West made its decision and, as such, Great-West violated the Plan terms by discontinuing them. A "vested right" is commonly defined as a "right that so completely and definitely belongs to a person that it cannot be impaired or taken away without the person's consent." Black's Law Dictionary 1349 (8th ed. 2004).

ERISA categorizes employment benefits as either welfare benefits or pension benefits. 29 U.S.C. § 1002(1)-(2). Here, the parties agree that the Plan in dispute is a welfare benefit plan. While ERISA mandates vested pension benefits, Congress did not mandate vesting for employee welfare benefit plans, like the health care plan at issue here. 29 U.S.C. §§ 1051(1), 1053; Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73, 78 (1995). "Therefore, an employer may unilaterally modify or terminate medical benefits at any time absent the employer's contractual agreement to the contrary." Jensen v. SIPCO, Inc., 38 F.3d 945, 949 (8th Cir. 1994) (quotation omitted). It is possible for welfare benefits to vest, however, if a promise to provide vested benefits is incorporated in some fashion into the formal written ERISA plan.[1] Hughes v. 3M Retiree Med. Plan, 281 F.3d 786, 790 (8th Cir. 2002). Whether such

---

[1]ERISA requires that employee benefit plans be established by a written instrument, 29 U.S.C. § 1102(a)(1), and SPDs are considered part of that plan document. See Jensen, 38 F.3d at 949. Indeed, "when conflict is apparent between provisions of a formal plan and provisions of a summary plan, the summary plan description prevails." Hughes, 281 F.3d at 790.

benefits are vested, then, is a matter of private contract and our inquiry begins with the written Plan documents.[2]

In our de novo[3] review of the Plan terms themselves, we give "'the language its common and ordinary meaning as a reasonable person in the position of the [plan] participant, not the actual participant, would have understood the words to mean.'" Hughes, 281 F.3d at 790 (quoting Chiles v. Ceridian Corp., 95 F.3d 1505, 1511 (10th Cir. 1996)); Barker v. Ceridian Corp., 122 F.3d 628, 632 (8th Cir. 1997) (Barker I). Plaintiffs have the burden of proof on the vesting issue. Hutchins, 110 F.3d at 1345.

When interpreting ERISA plan documents, the Supreme Court has referred us to, and explicated, the law of trusts:

> The terms of trusts created by written instruments are "determined by the provisions of the instrument as interpreted in light of all the circumstances and such other evidence of the intention of the settlor with respect to the trust as is not inadmissible."

Firestone, 489 U.S. at 112 (quoting Restatement (Second) of Trusts § 4 cmt. d (1959)). The question of what "other evidence" is admissible turns on the relative ambiguity of the plan provision being construed:

---

[2]We do not refer to a common-law claim for breach of contract, arising under state law. "Such a claim is, no doubt, preempted by ERISA. We refer instead to a claim under ERISA itself, 29 U.S.C. § 1132(a)(1)(B), brought by beneficiaries to recover benefits due under the Welfare Benefits Plan, to enforce their rights under the Plan, and to clarify their rights to future benefits under the Plan." Howe v. Varity Corp., 36 F.3d 746, 751 (8th Cir. 1994) (Howe II).

[3]We note for clarification that we are applying a de novo standard of review because we are reviewing whether the affected welfare benefits were vested or not, an issue of contract; a question of law.

That intent [of the settlor] is first sought by careful examination of the trust clause in question, giving the words in that clause their ordinary meanings. If the construction question cannot be resolved by reference to the clause alone, the court will examine the entire trust instrument to determine the creator's intent and purposes . . . . The third step becomes necessary when the intent or meaning of the settlor . . . cannot be determined by reference to the provisions of the trust instrument itself. [At that point e]xtrinsic evidence will be admitted by the court to assist it in determining the meaning and effect of the particular clause.

George G. Bogert, et al., The Law of Trusts & Trustees § 182 (rev. 2d ed. 1979) (footnotes omitted).

The district court, considering vesting the "key issue", reiterated a previous finding that the Plan was ambiguous as it relates to vesting of benefits. Because the "provided, however" language of section 5.1 of the Plan states that "no such modification shall divest a Participant of benefits under the Plan to which he has become entitled prior to the effective date of the amendment," the court held that "clearly" certain benefits do vest–the question the district court found it faced was whether welfare benefits were those sort of benefits. Given its ambiguity determination, the court then analyzed all of Plaintiffs' extrinsic evidence. The court acknowledged that normally an analysis of extrinsic evidence would require a trial on the merits in order to determine the factual dispute regarding whether an employer intended that certain benefits vest, but determined that there was no dispute regarding the extrinsic evidence here. Accordingly, the district court felt it was appropriate to resolve this issue on summary judgment. The court ruled in favor of Plaintiffs generally based upon the following evidence presented in support of summary judgment: 1) testimony of Plan representatives stating that the participant becomes entitled to welfare benefits upon a determination of disability; 2) statements from Plan participants themselves regarding how they interpret the Plan language; and 3) evidence of Great-West's interpretation of the Plan (in letters, handbooks, and the Plan

itself) provisions that the Plan provides for the continuation of welfare benefits for the duration of a Plan participant's disability, or until age 65 or death. This evidence, coupled with the section 5.1 language that states the clause is inapplicable to those benefits to which a participant has become entitled, formed the basis of the district court's determination that these welfare benefits were vested. The court discussed three cases in making its determination: Jensen, Barker I, and Barker v. Ceridian Corp., 193 F.3d 976 (8th Cir. 1999) (Barker II). Both Jensen and Barker II came to us on appeal following bench trials.

On appeal, Plaintiffs claim that Jensen, Barker I, and Barker II support the proposition that if there is a conflict between a promise of benefits for a specified duration and a reservation-of-rights clause, an ambiguity exists that must be resolved through extrinsic evidence. Jensen, 38 F.3d at 950; Barker I, 122 F.3d at 638; Barker II, 193 F.3d at 979. They claim that just such an ambiguity exists here between the language of section 5.1 and the SPD language concerning the duration of long-term disability benefits.

Jensen, Barker I, and Barker II each turned to extrinsic evidence to determine whether particular welfare benefits were vested. Jensen reviewed medical benefits under two medical benefit plans for salaried pensioners. 38 F.3d at 947. The district court and the appellate court determined the benefits at issue in Jensen were vested. Id. The Jensen plans *did* contain reservation-of-rights clauses that gave the Board of Directors the power to alter, amend or annul any of the provisions in the plan. Id. at 948. The Jensen plaintiffs pointed out, however, that the applicable SPD did not disclose that the company could amend or terminate retiree medical benefits. Id. at 949. The "Termination of Coverage" clause in the SPD promised benefits until the retiree dies, or a spouse divorces, or a child marries or reaches the age of 19. Id. at 949-50. The court, seeing a conflict in the two documents, recognized that a "reservation-of-rights provision is inconsistent with, and in most cases would defeat, a claim of vested benefits." Id. at 950. Even so, the appellate panel held that the

-11-

provisions were ambiguous in <u>Jensen</u> because it was not clear whether the right to change or terminate benefits only applied to those participants covered by the plan but not yet retired or whether it also included already retired pensioners. <u>Id.</u> The plaintiffs in <u>Jensen</u> presented a "wealth" of "overwhelming" extrinsic evidence supporting their contention that the company intended that the medical benefits would vest upon retirement and the panel agreed. <u>Id.</u> at 950-51. This evidence included testimony of multiple former executive management employees regarding the company's contemporaneous intent to vest at the time the relevant plans were adopted and the company's persistent interpretation of the plan as providing vested benefits. <u>Id.</u>

The <u>Barker</u> cases likewise found particular language in a reservation-of-rights clause ambiguous–this time in the context of discussing whether certain long-term disability benefits were vested, or not. <u>Barker I</u>, 122 F.3d at 630. Like <u>Jensen</u>, the plan in <u>Barker</u> "provided a welfare benefit until a person was no longer eligible for the plan, yet retained the right to amend or terminate the plan." <u>Id.</u> at 635. Again, we were unable to discern whether the reservation-of-rights clause preserved the right to amend the plan only as to those who would become entitled to the benefits in the future, or also as to those already on disability. <u>Id.</u> at 638-39. On remand from the <u>Barker I</u> determination of ambiguity, the district court then reviewed the extrinsic evidence concerning the company's intent to vest, which also found its way to our court. <u>Barker II</u>, 193 F.3d at 978. Here, too, the class of plaintiffs provided a wealth of extrinsic evidence in support of their claim of vesting including, for example, testimony of plan participants, testimony that employer representatives had told participants they could not lose the benefits once they were disabled, testimony from former management employees regarding their understanding that the intent was to vest and that they explained it as such to employees, and testimony from the employee in charge of preparing the employee welfare plan regarding the contemporaneous intent of the plan sponsor at the time the language was implemented. <u>Id.</u> at 979-80.

This evidence supported a determination that the plan sponsor, indeed, intended to vest the welfare benefits at issue.  Id. at 983.

Great-West disagrees with Plaintiffs' reliance on Jensen, Barker I, and Barker II. Great-West claims the Plan language is unambiguous and relies primarily upon our decision in Howe v. Varity Corp., 896 F.2d 1107 (8th Cir. 1990) (Howe I) as an example of similar unambiguous language in a plan's reservation-of-rights clause. Great-West goes on to argue that even if the panel finds ambiguity in this Plan's language, questions of material fact remain as to the sufficiency of Plaintiffs' extrinsic evidence concerning the company's alleged intent to vest.  Howe I was an appeal from the grant of a preliminary injunction requiring the employer to reinstate portions of a terminated employee welfare benefit plan.  Id. at 1108.  We reversed.  Id. at 1112. In Howe I, the court reviewed language in a reservation-of-rights clause that stated that the company reserved the right to amend or terminate the plan at any time.  The clause also stated that "[h]owever, the right to amend or terminate the Plan shall not, in any way, affect an Employee's right to claim benefits, diminish, or eliminate any claims for benefits under the provisions of the Plan to which the Employee shall have become entitled prior to the exercise of the Company's right, through its Board, to terminate or amend."  Id. at 1108.  We disagreed with the district court that the "shall have become entitled" language constituted explicit vesting language securing retirement benefits for employees.  Id. at 1109.  In doing so, we reviewed the entire trust document and reiterated that "an employer's promise to future retirees that benefits 'will continue' could not be read as a promise of vested lifetime benefits in the face of a termination clause."  Id. (quoting DeGeare v. Alpha Portland Indus., Inc., 837 F.2d 812, 814 (8th Cir. 1988)).  "[T]he mere fact that employee welfare benefits continue in retirement does not indicate that the benefits become vested for life at the moment of retirement."  Id. at 1110.  As such, we held that the district court erred in granting a preliminary injunction in favor of the employees on their vesting claim.  Id.

at 1110.[4]   And, because we found the language  unambiguous, we further held the district court erred in reviewing extrinsic evidence.  Id.

Turning first to the words of the Plan and determining whether any ambiguities abound, we focus our inquiry on the Plan's reservation-of rights-clause.  Stated again, section 5.1 of the Plan provides:

> 5.1   Amendment of Plan.  The Company reserves the right at any time or times to amend the provisions of the Plan to any extent and in any manner that it may deem advisable, by a written instrument signed by an officer of the Company; provided, however, that no such modification shall divest a Participant of benefits under the Plan to which he has become entitled prior to the effective date of the amendment.

Here, we agree with the district court that the Plan language is ambiguous as it relates to Great-West's intent to vest.  The instant situation is more akin to that discussed in Jensen and Barker I & II where the language in the reservation-of-rights clause in the Plan is clouded–either on its own or when juxtaposed with the durational language contained in the SPD.  Examining only section 5.1 as the edicts of trust law dictates, we are unable to say that its language is so unambiguous as to make unnecessary any reference to other Plan provisions and extrinsic evidence.  The reservation-of-rights clause in the Plan is not facially unambiguous.  The "provided, however" language either refers to "pipeline" claims[5] as Great-West argues, or it refers

---

[4]The employees' claim for breach of fiduciary duty remained, however, and was ultimately resolved in their favor by the Supreme Court.  Varity Corp. v. Howe, 516 U.S. 489, 515 (1996).

[5]That section 5.1 only excepts "pipeline" claims is the argument Great-West made before the district court and again before us on appeal.  There is no universal definition of what a "pipeline" claim encompasses, although generally it refers to claims that have been incurred, and are thus covered, at the time a particular action

to the exclusion of certain, already vested, benefits–we cannot say which for certain. This is not the sort of unambiguous reservation-of-rights clause we have previously found to defeat a claim that welfare plan benefits are vested. See Stearns v. NCR Corp., 297 F.3d 706, 709 (8th Cir. 2002) (reviewing a reservation-of-rights clause that merely stated "[t]he Company reserves the right to change or cancel the Plan, or any benefits under the Plan, at any time"); Hughes, 281 F.3d at 789, 792-93 (reviewing a reservation-of-rights clause that stated that "[t]he Company fully intends to continue this Plan indefinitely, but reserves the right to change or discontinue it if necessary," and that coverage will stop "if 3M discontinues the Plan.").

---

(amendment, termination) occurs–or, in other words, are in the "pipeline." Howe I discusses the term in the context of a reservation-of-rights clause that exempted claims "to which the Employee shall have become entitled prior to the [Company's termination of the Plan]." Howe I, 896 F.2d at 1108. We held that such language protected an employee's right to "claim benefits for an injury or disabling event that occurs prior to termination of the plan." Id. at 1110. The example we provided was if a covered employee were to break a bone one day before the plan is terminated, we pointed out that such employee would be "entitled" to medical expense reimbursement for the injury. Id. at n.5. The employer in Howe further conceded that the plan's reservation-of-rights clause was a "pipeline" provision that protected "employees and retirees against termination of benefits once they suffer an injury or illness . . . [and that] disabled persons fall within this group and are thus entitled to continued disability benefits if their disability occurred prior to the plan termination date." Id. at n.6. Great-West argues that Howe I supports its position here that the Plan language is unambiguous and claims that Howe I makes a distinction between disability benefit payments and medical benefits offered during disability. We refrain from reading into Howe that which is not there. But, we do note that we made no such explicit distinction in Howe I–indeed we never defined what was meant by the word "benefits" in our discussion or whether it certainly excluded medical payments–and Great-West points us to no particular cite in support of that distinction. Perhaps Great-West will be able to make this argument more pellucid upon remand. We focus today only on the Plan language that drives our analysis.

Given this ambiguity, we follow the dictates of trust law and expand our review to examine the entire trust document itself to determine the settlor's intent. This is where our review distinguishes itself from Howe I. Although the 2004 SPD reiterates the section 5.1 language that Great-West may change, amend or terminate at its discretion, and further sets out that coverage will end on the date Great-West terminates the benefits described in the SPD, it also states that in the case of ineligibility, "[i]f your Service ends due to Illness and you have been approved for LTD benefits, coverage will continue during the course of the total disability," and in the section entitled "How Long Will My Benefits Continue?", it states:

> Your benefits will continue until the earliest of these dates:
> • The date you are no longer Totally Disabled;
> • The date you fail to give proof of your Total Disability as required;
> • The last day of the calendar month in which the maximum benefit period ends; or
> • The date of your retirement.

At best, this language is ambiguous. Unlike Howe I, where we held that statements that welfare benefits "continue in retirement" in the plan documents did not pinpoint retirement as a vesting trigger, 896 F.3d at 1110, the alleged vesting language here between the Plan and the SPDs is more akin to the clarity, or lack thereof, we discussed in Barker I, 122 F.3D at 638. This is not to say that these benefits are vested but rather that extrinsic evidence is necessary to make that determination.

At this stage trust law allows us to admit extrinsic evidence if the intent of the settlor cannot be ascertained by examination of the trust instrument itself (here, the formal ERISA plan and the SPD). This is where we part ways with the district court. We disagree with the conclusion that there remains no issue of material fact as to whether Great-West intended that these benefits vest. The Supreme Court has made clear that "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

The extrinsic evidence presented by Plaintiffs includes template letters, handbook statements and the like stating that welfare benefits continue for the length of a participant's disability. Plaintiffs also presented testimony of Great-West employees who were aware of such language. The evidence offered here is far from the "overwhelming" and "abundant" evidence analyzed in cases such as Jensen and Barker and is insufficient to support summary judgment. Jensen, 38 F.3d at 950-51; Barker II, 193 F.3d at 982. Indeed, Jensen and Barker were not reviewed on summary judgment motions, but after trial. Most critically, though, we specifically point out that the district court erred in concluding that Great-West failed to present any evidence in support of its position. It did. And, for the sake of argument, even if the sum of Great-West's evidence merely points to the inadequacy of Plaintiffs' evidence as the district court held, and we do not believe that is the case, there remains an issue of fact on the ultimate issue of Great-West's intent to vest. At the very least, there remains an issue of fact on an element upon which Plaintiffs bear the burden. Accordingly, we find that summary judgment was premature and remand for a trial on the issue of whether the welfare benefits here were vested.[6]

## D. Remedies

In their cross-appeal, Plaintiffs claim the district court erred in failing to award past-due benefits under 29 U.S.C. § 1132(a)(3). They claim that such benefits flow from the district court's finding that the Plan amendment was unlawful. Additionally, Plaintiffs claim the district court erred in dismissing their prayer for recovery of Great-West's "ill-gotten gains"–that is, the difference between the premium rate paid by active employees and the higher rate paid by Plaintiffs for the continuing coverage offered through COBRA. The district court determined these damages were

---

[6]In resolving that factual dispute, the district court may consider interpretive statements made by Great-West, past practices, customary usage in the trade, and other competent evidence. Chiles v. Ceridian Corp., 95 F.3d 1505, 1519 n.12 (10th Cir. 1996).

-17-

compensatory in nature, not equitable, and were thus unavailable under section 1132(a)(3).[7]

Because this issue is likely to arise again on remand, we address it. We review de novo issues involving the interpretation of ERISA. Calhoon v. Trans World Airlines, Inc., 400 F.3d 593, 596 (8th Cir. 2005). In relevant part, ERISA provides that, "[a] civil action may be brought . . . by a participant, beneficiary, or fiduciary . . . to obtain other appropriate equitable relief." 29 U.S.C. § 1132(a)(3)(B). In recent years, the Supreme Court has clarified what does and does not constitute "appropriate equitable relief" for purposes of a claim brought pursuant to section 1132(a)(3). Sereboff v. Mid Atl. Med. Servs., Inc., 547 U.S. 356 (2006); Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204 (2002). This section of ERISA authorizes only those categories of relief that are *typically* available in equity. Sereboff, 547 U.S. at 361. Not all relief falling under the "restitution" umbrella is available in equity. Id. at 362. Whether restitution is legal or equitable depends upon the basis for the plaintiff's claim and the nature of the remedies sought. Knudson, 534 U.S. at 213. "[F]or restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession." Id. at 214. "Constructive trusts and equitable liens are the most common forms of restitution in equity." Calhoon, 400 F.3d at 596.

> In determining whether the nature of the monetary relief sought is equitable or legal, we ask whether the value of the harm done that forms the basis for the damages is measured by the loss to the plaintiff or the gain to the defendant, and whether the money sought is specifically identifiable as belonging in good conscience to the plaintiff and can

---

[7]We decline to address Plaintiffs' third issue raised in their cross-appeal–their request to allow class members an opportunity to appeal denial of their disability benefits. We agree with the district court that Great-West's decision to grant or deny long-term disability status is immaterial, as is the appeals process it employs for reviewing disability decisions. An individual employee's decision to appeal the denial of benefits is unrelated to this suit.

clearly be traced to particular funds or property in the defendant's possession. . . . When funds are traceable, the district court must limit the recovery by imposing a constructive trust over only the transferred funds; it may not award restitution of a sum certain or find personal liability, both of which are impermissible legal remedies under section 1132(a)(3).

Id. at 596-97 (internal quotations omitted). Sereboff adds that "equitable relief" includes a claim for restitution where the plaintiff seeks to recover "specifically identifiable" funds, that are due the plaintiff under the terms of the plan, and that are within the defendant's "possession and control." 547 U.S. at 362.

While we acknowledge that certain forms of restitution or monetary relief may lie in equity, on the facts of this matter we agree with the district court regarding the nature of Plaintiffs' damages and conclude that Plaintiffs' claims for past-due benefits and COBRA "overpayments" are precluded. The requested relief here is in the nature of legal relief because it seeks to impose personal liability on Great-West, is measured by Plaintiffs' loss, and does not involve traceable funds that belong to Plaintiffs and are being unlawfully held by Great-West. See Calhoon, 400 F.3d at 598 (concluding similarly that relief in the form of restitution of medical bills and costs is precluded under section 1132(a)(3)).

## III.    CONCLUSION

For the reasons stated herein, we affirm the district court's determination regarding the issue raised in Plaintiffs' cross-appeal and dismiss same. We reverse for trial the issue of whether Great-West originally intended that these long-term disability welfare benefits vest once a participant became disabled.

_____