FILED
United States Court of Appeals
Tenth Circuit

July 17, 2009

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

EDWARD J. KERBER; NELSON B.
PHELPS; JOANNE WEST; NANCY
A. MEISTER, THOMAS J.
INGEMANN, JR., individually, and as
representatives of plan participants
and plan beneficiaries of the Qwest
Pension Plan,

     Plaintiffs-Appellants,

v.

QWEST PENSION PLAN; QWEST
EMPLOYEES BENEFIT
COMMITTEE; QWEST
COMMUNICATIONS
INTERNATIONAL INC.; QWEST
PENSION PLAN DESIGN
COMMITTEE,

     Defendants-Appellees.

No. 08-1387

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 1:05-cv-0478-BNB-KLM)**

---

Curtis L. Kennedy, Denver, Colorado, for Plaintiffs-Appellants.

John Houston Pope of Epstein, Becker & Green, P.C., New York, New York,
(Elizabeth I. Kiovsky, Baird & Kiovsky, LLC, Denver Colorado, with him on the
brief), for Defendants-Appellees.

---

Before **BRISCOE, BRORBY,** and **McCONNELL**, Circuit Judges.

_____

**BRISCOE**, Circuit Judge.

_____

Plaintiffs, former employees of U.S. West, Inc. (U.S. West) and Qwest Communications International, Inc. (Qwest), filed this putative class action pursuant to the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001-1461, challenging certain amendments to an employee benefit plan that purported to eliminate a so-called "pensioner death benefit." The district court granted summary judgment in favor of defendants. Plaintiffs now appeal from that ruling. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

I

### A. The U.S. West and Qwest Pension Plans

*The 1984 U.S. West Pension Plans*

Effective January 1, 1984, U.S. West was created as a result of a court-ordered divestiture of the American Telephone & Telegraph Company's (AT&T) local telephone operations. The divestiture transaction also created two separate pension plans, both of which were established as successors to similar AT&T pension plans: the U.S. West Pension Plan (1984 Occupational Pension Plan) and the U.S. West Management Pension Plan (1984 Management Pension Plan).

2

These two 1984 pension plans included what was called the "Death Benefit Plan," which provided for death benefits to be paid to certain survivors of employees and retirees. The Death Benefit Plan included three components: (1) the Sickness Death Benefit, which provided death benefits in the event an active employee died as a result of sickness or injury; (2) the Accidental Death Benefit, which provided death benefits in the event an active employee died from an on-the-job accident; and (3) the Pensioner Death Benefit. The Pensioner Death Benefit provided death benefits to certain qualified beneficiaries, if they existed, of retired employees receiving a service or disability pension. More specifically, the Pensioner Death Benefit, which was generally equivalent to twelve months' wages as of the retired employee's date of retirement, was paid to a "mandatory beneficiary," which included an "eligible surviving Spouse" (i.e., a spouse living with the retiree at the time of the retiree's death), "eligible dependent children" (dependent children up to age 23), an "eligible dependent parent" (i.e., a dependent parent living with or near the retiree), or "other beneficiaries" (which encompassed a wider circle of dependent family members). App. at 570. If no mandatory beneficiary existed, then the benefit was not paid, except for a discretionary burial expense of up to $500. Also, if a retiree's otherwise eligible mandatory beneficiary filed suit against Qwest in connection with the retiree's death, no benefit was paid.

The two 1984 pension plans each contained a reservation of rights clause

3

reserving for the respective plan sponsor the power and authority to alter the

benefits thereunder.   Those clauses each stated, in pertinent part:

> The [U.S. West Employees' Benefit] Committee, with the consent of the Chairman of the Board . . . and subject to the approval of the Board of Directors . . . may from time to time make changes in the Plan as set forth in this document, and the Company may terminate said Plan, but such changes or termination shall not affect the rights of any employee, without his consent, to any benefit or pension to which he may have previously become entitled hereunder.

Id. at 638, 659.

*The 1993 Revisions to the U.S. West Pension Plans*

Effective January 1, 1993, U.S. West merged its two 1984 pension plans

into one (the 1993 Pension Plan), and, in doing so, effectively revised certain

provisions of the two 1984 plans.  In particular, § 7.11 of the 1993 Pension Plan,

entitled "Termination of Death Benefits," provided as follows:

> Effective February 28, 1993, the provisions of this Article VII [covering Death Benefits] shall not apply to individuals first hired on or after March 1, 1993.  The survivors of any individual first hired on or after March 1, 1993 shall not be entitled to any benefits under this Article VII.  Individuals who have a Term of Employment that includes any period prior to March 1, 1993, including individuals who are re-employed on or after March 1, 1993 and whose Term of Employment is bridged so that it includes periods before March 1, 1993, shall be entitled to a frozen benefit under this Article VII as of February 28, 1993.  For purposes of calculating the frozen benefit, "Wages" under Section 7.9 shall be based on the last twelve months of employment preceding March 1, 1993.

Id. at 670.  In short, § 7.11 limited eligibility for the Pensioner Death Benefit to

individuals hired on or before March 1, 1993, and it prospectively froze the

4

payment level for the benefit.

The 1993 Pension Plan, like the two preceding 1984 plans, included a reservation of rights clause:

> U S WEST expects this Plan to be permanent, but as future conditions cannot be foreseen it reserves the right to amend the Plan at any time, without prior notice to anyone. * * * Amendments may modify the rights and interests of Employees who are Participants in the Plan at the time thereof as well as future Participants but amendments may not diminish the accrued benefit of any Participant as of the effective date of such amendment or divert any funds in the Trust to purposes other than for the exclusive benefit of Participants and their beneficiaries.

Id. at 671.

Lastly, the 1993 Pension Plan, unlike the two preceding 1984 plans, expressly defined the term "accrued benefit" to exclude any death benefits. Id. at 665.

*The 1997 Revision to the U.S. West Pension Plan*

Effective January 1, 1997, the 1993 Pension Plan was amended to allow certain management employees to elect a lump sum payout of their retirement benefits, and to include in that lump sum payout a discounted version of the Petitioner Death Benefit (the "DLS Equivalent"[1]) that assumed the retiree would be survived by a beneficiary. If a management employee elected to receive this

_____

[1] The phrase "DLS Equivalent" is taken directly from the 1993 Plan, as amended in 1997, and it essentially refers to an actuarial equivalent to the Pensioner Death Benefit that would normally be paid to a retiree's designated beneficiary upon the retiree's death.

discounted version of the Pensioner Death Benefit in his or her lump sum payout, "no other Death Benefit [wa]s payable . . . at any time, including the participant's death . . . ." Id. at 685. These amendments to the Death Benefit provisions applied only to ordinary retirements, and not as part of any early retirement program. Further, the amendments did not materially alter the definition of "accrued benefit"; in other words, death benefits were not considered to be "accrued benefits" under the plan.

*The Qwest Plan*

In 2000, Qwest acquired and merged with U.S. West. As a result of this merger, the 1993 Pension Plan (as amended in 1997) was replaced by the Qwest Pension Plan (the Plan), and Qwest became the Plan Sponsor. The Qwest Employee Benefit Committee (the Committee) was the Plan's "named fiduciary" and was responsible for, among other things, administration of the Plan, including appointment of other fiduciaries and interpretation of the Plan's provisions.

The Plan was similar in all relevant respects to its predecessor plans. In particular, the Plan included a "DEATH BENEFITS" section that effectively provided for payment of a Pensioner Death Benefit to the qualified beneficiary of any employee hired prior to March 1, 1993. Id. at 599-600, 603. Also, consistent with the 1997 amendments to the 1993 Pension Plan, the Plan allowed for certain employees to receive, as part of a lump sum payout at retirement, the DLS Equivalent. Further, the Plan expressly defined the phrase "accrued benefit" to

6

exclude any death benefits.  Lastly, the Plan included a reservation of rights

provision that read:

> The Company expects this Plan to be permanent, but as future
> conditions cannot be foreseen it reserves the right to amend the Plan
> at any time, without prior notice to anyone. . . .  Amendments may
> modify the rights and interests of Employees who are Participants in
> the Plan at the time thereof as well as future Participants but
> amendments may not diminish the accrued benefit (as defined in
> Section 411(d)(6) of the Code) of any Participant as of the effective
> date of such amendment.

Id. at 607.

*Amendment 2003-5 to the Plan*

In late 2003, the Plan's Design Committee enacted Amendment 2003-5.

Amendment 2003-5, in pertinent part, amended the Plan to eliminate the

Pensioner Death Benefit, including the DLS Equivalent option, for employees

retiring on or after January 1, 2004.

### B.  The Plaintiffs

Edward Kerber and Nelson Phelps, Oregon and Colorado residents,

respectively, were formerly employed as management-level employees within the

human resources department at U.S. West.  Id. at 26-27.  Both men retired,

effective February 28, 1990, after numerous years of service with U.S. West.  Id.

Both men currently receive a service pension in the form of a monthly annuity.

Id.

Joanne West and Nancy Meister, Utah and Minnesota residents,

7

respectively, were formerly employed with Qwest. Id. at 27-28. Both women retired, effective February 11, 2004, after numerous years of service with Qwest. Id. Both received a lump sum service pension from the Qwest Pension Plan which did not include the value of any Pensioner Death Benefit. Id.

Thomas Ingemann, Jr., a Minnesota resident, retired from Qwest, effective March 2, 2005, after almost forty years of service. Id. at 28. Ingemann currently receives a service pension annuity from the Qwest Pension Plan. Id.

### C. This Litigation

On March 15, 2005, Kerber, Phelps, West, Meister, and Ingemann (the plaintiffs) filed suit against the Qwest Pension Plan, Qwest Employees Benefit Committee, and Qwest. Plaintiffs twice amended their complaint, first on May 6, 2005, and again on November 18, 2005.

In the "Preliminary Statement" section of their second amended complaint, plaintiffs alleged that "[f]or many decades, a stable feature of the Qwest Pension Plan (and predecessor plans) ha[d] been [the] 'Pension[er] Death Benefit,'" id. at 24, and that "Qwest and its predecessors ha[d] a long history of treating the Pension[er] Death Benefit as an 'accrued' or protected pension benefit payable from trust fund assets," id. at 25. Plaintiffs noted that, pursuant to Amendment 2003-5, Qwest had "amended the . . . Plan so as to eliminate the Pension[er] Death Benefit for persons retiring on or after January 1, 2004," and alleged that "[a]n actual controversy exist[ed] between" themselves and defendants "as to

8

whether" this "amendment [wa]s illegal and whether the Pension[er] Death Benefit should be treated as a vested, protected or accrued defined pension benefit under the" Plan. Id. Accordingly, plaintiffs alleged they were "asserting claims for relief under ERISA . . . to clarify . . . Plan participants' rights to future Pension[er] Death Benefits under the terms of the [P]lan and for other declaratory, injunctive and appropriate equitable relief." Id. at 25-26.

The second amended complaint asserted four claims for relief. The first claim for relief asserted a breach of fiduciary duty and equitable estoppel arising out of defendants' alleged failure to disclose material information. Id. at 56. More specifically, this claim alleged that "[p]rior to December 2003," none of the defendants "made a formal disclosure in the SPDs [summary plan descriptions] distributed to" the plaintiffs and other Plan participants "advising that the Pension[er] Death Benefit was not a vested or protected benefit or that the Pension[er] Death Benefit could either be reduced or eliminated . . . even in the absence of a PLAN termination." Id. at 57. The claim further alleged that the position adopted via Amendment 2003-5 "that the Pension[er] Death Benefit c[ould] be either reduced or eliminated . . . was never disclosed to" the plaintiffs or other Plan participants "when they were making their respective retirement choices." Id. at 57-58. In connection with this claim, plaintiffs sought, in pertinent part, "a declaration that . . . the Pension[er] Death Benefit" was "a vested, protected or accrued pension benefit, not subject to reduction or

9

elimination absent a PLAN termination," and "an order forbidding Defendants and successors from ever altering, modifying, or eliminating or terminating" the plaintiffs' and other Plan participants' "expected Pension[er] Death Benefits in the absence of a PLAN termination." Id. at 60.

The second claim for relief, entitled "Violations Due to Illegal Elimination of Pension[er] Death Benefit," id. at 60, alleged that in four consecutive years beginning in 1998, the Plan sponsor, acting pursuant to "the provisions of Section 401(h) and 420 of the Internal Revenue Code," made "qualified transfers" and "use[d] 'excess assets' in the pension plan to fund retiree medical benefits for persons who [we]re retired participants" in the Plan. Id. at 61. The claim further alleged that, "[i]n accordance with the requirements of [Internal Revenue Code] § 420, and applicable federal regulations," each such qualified transfer resulted in the plaintiffs' "pension benefits, including the Pension[er] Death Benefit, bec[oming] nonforfeitable . . . ." Id. at 62. In turn, the claim alleged that Amendment 2003-5 "violate[d] the anti-cutback provisions of ERISA Section 204(g), 29 U.S.C. § 1054(g), since accrued benefits ha[d] been reduced or eliminated." Id. at 64. Based upon these allegations, the second claim for relief sought: (a) "an order reforming the PLAN" by "striking . . . Amendment 2003-5"; and (b) "an order requiring the PLAN to notify and make payment of the correct amount of the Pension[er] Death Benefit . . . to each PLAN participant and qualified beneficiary to whom the Pension[er] Death Benefit became payable after

10

January 1, 2004." Id.

The third claim for relief, entitled "ERISA Section 502(a)(1)(B) Claim to Clarify Future Rights to the Pension[er] Death Benefit," sought "a declaration that those persons receiving a monthly pension annuity and their mandatory beneficiaries, to the extent there [we]re any at time of death, [we]re entitled to the Pension[er] Death Benefit from the PLAN," id. at 65, and "that all persons who retired on or after January 1, 2004 and received a lump sum distribution [we]re entitled to an additional lump sum payment representing the unpaid Pension[er] Death Benefit, plus interest," id. at 66.

The fourth claim for relief, entitled "ERISA Section 502(a)(2) Claim to Correct Faulty PLAN Documents, Including SPD," id., alleged that "Qwest ha[d] issued a current SPD which falsely state[d] the Pension[er] Death Benefit [wa]s a welfare benefit, subject to reduction or elimination at any time," id., and sought "an order requiring [defendants] to correct the . . . faulty language in the . . . SPD and issue a corrected SPD with language disclosing the Pension[er] Death Benefit [wa]s a vested, protected or accrued defined pension benefit, not subject to reduction or elimination absent a PLAN termination," id. at 66-67.

Defendants moved to dismiss, for lack of subject matter jurisdiction, the second and third claims for relief set forth in the second amended complaint, as asserted by plaintiffs Kerber and Phelps. The motion noted that Kerber and Phelps, both "Pre-2004 Retirees," "d[id] not allege that Qwest announced any

11

intention to discontinue providing the [Pensioner] Death Benefit to . . . [pre-2004] retirees . . . ." Id. at 113. On October 5, 2006, the district court[2] issued an order granting in part and denying in part defendants' motion to dismiss. Id. at 390. In doing so, the district court concluded that Kerber and Phelps lacked standing to bring the second claim for relief because they "each retired in 1990," yet "Claim Two assert[ed] violations caused by, and s[ought] remedies for, the adoption of Amendment 2003-5 which eliminated . . . the Death Benefit for Plan participants who retired on or after January 1, 2004." Id. at 396. The district court also concluded, with respect to the third claim for relief, that Kerber and Phelps had asserted a valid claim in that "they allege[d] that they ha[d] made irrevo[c]able retirement decisions based on the prior definition of [Pensioner] Death Benefit as a protected one and . . . [we]re unable to adjust their retirement plans to address the benefit as one that c[ould] be eliminated at any time." Id. at 401.

Defendants subsequently moved for summary judgment with respect to all remaining claims. On September 19, 2008, the district court issued an order granting defendants' motion in its entirety. Turning first to Claim Three of the second amended complaint, the district court concluded that plaintiffs had failed to "establish that the Pensioner Death Benefit was either (1) an accrued pension benefit or (2) a welfare benefit that contractually vested by virtue of the plan's

---

[2] On January 10, 2006, the parties consented to the exercise of jurisdiction over the case by a United States magistrate judge. Our use of the term "district court" thus refers to the rulings issued by the magistrate judge in this case.

12

language and was, therefore, protected from reduction or elimination by ERISA's anti-cutback rule." Id. at 1199. More specifically, the district court concluded "the Pensioner Death Benefit d[id] not meet ERISA's definition of a pension benefit because it d[id] not provide 'retirement income to employees,'" or "'result in a deferral of income.'" Id. at 1201. Further, the district court noted that plaintiffs had failed to "offer any authority to support their assertion that the Pensioner Death Benefit change[d] its character upon inclusion in a lump sum pay out of accrued retirement benefits upon early retirement [i.e., selection of the DLS Equivalent]," id. at 1207, and it concluded that "[i]nclusion [of the Pensioner Death Benefit] in the lump sum election d[id] not change it into an accrued pension benefit." Id. at 1208. The district court also rejected plaintiffs' argument that the Pensioner Death Benefit was a "retirement-type subsidy" under ERISA's so-called anti-cutback provision, 29 U.S.C. § 1054(g)(2)(A). Finally, the district court rejected the notion that the Pensioner Death Benefit had contractually vested by way of the "payment priority status" of the Pensioner Death Benefit in the Plan's termination clauses, or as a result of language in the various plans and SPDs stating that the Pensioner Death Benefit "w[ould] be paid" and that beneficiaries were "entitled" to collect the Pensioner Death Benefit.

The district court next turned to Claim Two of the second amended complaint. The district court noted that the plaintiffs, in their response to

13

defendants' summary judgment motion, did "not address their assertion . . . that the Pensioner Death Benefit vested when the Plan Sponsor transferred assets under Section 420 of the [IRC]," and, "[t]o the extent the plaintiffs continue[d] to assert this claim, they d[id] not cite any plan language that constitute[d] the 'clear and express language' of vesting required under [this court's decision in] Chiles[ v. Ceridian Corp., 95 F.3d 1505 (10th Cir. 1996)]." Id. at 1216.

In addressing Claim One of the second amended complaint, the district court first noted that plaintiffs, in their response to defendants' summary judgment motion, "assert[ed] that 'since Amendment 2003-5 violate[d] the anti-cutback provisions of ERISA Section 204(g),'" they could "'prove their claim that Plan fiduciaries ha[d] violated ERISA Section 404(a) duties to comply with ERISA's statutory requirements.'" Id. The district court rejected this theory, noting that under the Supreme Court's decision in Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 443 (1999), "'[p]lan sponsors who alter the terms of a plan do not fall into the category of fiduciaries,'" and in turn concluding that "defendants were not acting as fiduciaries when implementing Amendment 2003-5 . . . ." Id. As for "plaintiff's claim for equitable estoppel," the district court first noted that this court "'ha[d] neither adopted nor rejected an equitable estoppel rule in the ERISA context.'" Id. at 1218 (quoting Cannon v. Group Health Serv. of Okla., Inc., 77 F.3d 1270, 1277 (10th Cir. 1996)). Assuming for purposes of argument that this court would adopt such a rule, the district court

14

concluded that "plaintiffs' equitable estoppel claim fail[ed] as a matter of law" because "there [wa]s an absence of misrepresentation of any term of the plan which would trigger the plaintiffs' reasonable detrimental reliance." Id. at 1218 (internal quotation marks omitted).

Finally, addressing Claim Four of the second amended complaint, the district court concluded it was "redundant of Claims One and Two," and that "defendants [were thus] entitled to summary judgment on" the claim. Id. at 1219.

Judgment was entered in the case on September 23, 2008. Plaintiffs subsequently filed a timely notice of appeal.

II

Plaintiffs challenge, on five separate grounds, the district court's grant of summary judgment in favor of defendants. "We review a district court's grant of summary judgment *de novo*, viewing the record in the light most favorable to the non-moving party." Potts v. Davis County, 551 F.3d 1188, 1192 (10th Cir. 2009). "Summary judgment is appropriate 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" Id. (quoting Fed. R. Civ. P. 56(c)).

*Did Amendment 2003-5 Violate ERISA's Anti-Cutback Rule?*

In their first issue on appeal, plaintiffs contend the district court erred in concluding that Amendment 2003-5, to the extent it eliminated the DLS

15

Equivalent, did not violate ERISA's anti-cutback rule. According to plaintiffs, the uncontroverted facts establish that Amendment 2003-5 violated the anti-cutback rule because, by eliminating the DLS Equivalent, it "either impermissibly eliminated an early retirement-type subsidy or impermissibly reduced an early retirement benefit." Aplt. Br. at 23.

"[W]hen Congress enacted ERISA it 'wanted to . . . mak[e] sure that if a worker ha[d] been promised a defined pension benefit upon retirement—and if he ha[d] fulfilled whatever conditions are required to obtain a vested benefit—he actually w[ould] receive it.'" Lockheed Corp. v. Spink, 517 U.S. 882, 887 (1996) (quoting Nachman Corp. v. Pension Benefit Guar. Corp., 446 U.S. 359, 375 (1980)). "ERISA's anti-cutback rule," set forth in 29 U.S.C. § 1054(g), "is crucial to this object . . . ." Cent. Laborers' Pension Fund v. Heinz, 541 U.S. 739, 744 (2004). The anti-cutback rule provides, in pertinent part:

(1) The accrued benefit of a participant under a plan may not be decreased by an amendment of the plan, other than an amendment described in section 1082(d)(2) or 1441 of this title.

(2) For purposes of paragraph (1), a plan amendment which has the effect of—
    (A) eliminating or reducing an early retirement benefit or a retirement-type subsidy (as defined in regulations), or
    (B) eliminating an optional form of benefit,
with respect to benefits attributable to service before the amendment shall be treated as reducing accrued benefits. In the case of a retirement-type subsidy, the preceding sentence shall apply only with respect to a participant who satisfies (either before or after the amendment) the preamendment conditions for the subsidy.

29 U.S.C. § 1054(g)(1), (2).

The general question thus posed here is whether Amendment 2003-5, by eliminating the DLS Equivalent for employees retiring on or after January 1, 2004, effectively decreased an "accrued benefit" of plaintiffs under the Plan.[3] ERISA defines the phrase "accrued benefit" to mean, "in the case of a defined benefit plan, the individual's accrued benefit determined under the plan and, except as provided in section 1054(c)(3) of this title, expressed in the form of an annual benefit commencing at normal retirement age . . . ."[4] Id. § 1002(23)(A). The phrase "defined benefit plan," in turn, is generally defined under ERISA as "a pension plan other than an individual account plan . . . ." Id. § 1002(35). Lastly, the anti-cutback rule itself expressly includes "early retirement benefits" and "retirement-type subsidies" within the definition of "accrued benefit." Thus, in short, an "accrued benefit" is an individual's right to a retirement benefit,

---

[3] Although it is not entirely clear from the plaintiffs' appellate pleadings, they do not appear to be arguing that the Pensioner Death Benefit, aside from the DLS Equivalent, constitutes an "accrued benefit" under ERISA. Even if plaintiffs were making such an assertion, it clearly lacks merit for the reasons outlined by the Third Circuit in In re Lucent, 541 F.3d 250, 255 (3d Cir. 2008) (dealing with a nearly identical Pensioner Death Benefit). We do note, however, that the Pensioner Death Benefit at issue in Lucent did not include a DLS Equivalent. For that reason, we conclude that Lucent does not provide any guidance as to the resolution of plaintiffs' claims in this appeal. Moreover, we are not persuaded that the Plan's classification of the DLS Equivalent as a "death benefit" is outcome determinative. Instead, ERISA's definitional provisions must be applied to the DLS Equivalent to determine its true character.

[4] 29 U.S.C. § 1054(c)(3) effectively allows for the payment of the accrued benefit in lump sum form, so long as certain requirements are met.

including early retirement benefits and retirement-type subsidies, under an ERISA pension plan.

Plaintiffs assert that the DLS Equivalent qualifies as an accrued benefit because it is either an early retirement-type subsidy or an early retirement benefit. For the reasons outlined below, however, we reject both of these assertions.

*1) "Retirement-Type Subsidy"?*

The phrase "retirement-type subsidy," though employed in the anti-cutback provision, is not otherwise defined in ERISA. In <u>Steiner Corp. Retirement Plan v. Johnson & Higgins of Cal.</u>, 31 F.3d 935 (10th Cir. 1994), this court concluded, after examining the legislative history of ERISA, that the term "subsidy," as employed in the phrase "retirement-type subsidy," refers to a benefit that "'continu[es] after retirement,'" and thus does not include a lump sump payment payable in full to an employee upon retirement. <u>Id.</u> at 940 (quoting S. Rep. No. 575, 98th Cong., 2d Sess. 30, <u>reprinted in</u> 1984 U.S.C.C.A.N. 2547, 2576). The legislative history referred to by this court in <u>Steiner</u> states, in pertinent part, as follows:

> The bill provides that the term 'retirement-type subsidy' is to be defined by Treasury regulations. The Committee intends that under these regulations, a subsidy <u>that continues after retirement</u> is generally to be considered a retirement-type subsidy. The Committee expects, however, that a qualified disability benefit, a medical benefit, a social security supplement, <u>a death benefit</u> (including life insurance), or a plant shutdown benefit (that does not continue after retirement age) will not be considered a retirement-type subsidy.

18

S. Rep. No. 98-575, at 30 (1984), <u>reprinted in</u> 1984 U.S.C.C.A.N. 2547, 2576

(emphasis added).

Although the district court did not cite to <u>Steiner</u>, it took specific note of

the above-quoted legislative history and concluded, on the basis thereof, that

"Congress did not intend to include death benefits within the definition of

'retirement-type subsidies.'" App. at 1209. Plaintiffs indirectly attack this

conclusion by arguing that a post-<u>Steiner</u> regulation adopted by the Secretary of

the Treasury on August 12, 2005[5] has effectively overruled <u>Steiner</u>'s

interpretation of the phrase "retirement-type subsidy." That regulation, 26 C.F.R.

§ 1.411(d)-3(g)(6)(iv), defines the phrase "retirement-type subsidy" to mean

> the excess, if any, of the actuarial present value of a retirement-type
> benefit over the actuarial present value of the accrued benefit
> commencing at normal retirement age or at actual commencement
> date, if later, with both such actuarial present values determined as of
> the date the retirement-type benefit commences. Examples of
> retirement-type subsidies include a subsidized early retirement
> benefit and a subsidized qualified joint and survivor annuity.

---

[5] "When Title I of ERISA was enacted to impose substantive legal
requirements on employee pension plans (including the anti-cutback rule), Title II
of ERISA amended the Internal Revenue Code to condition the eligibility of
pension plans for preferential tax treatment on compliance with many of the Title
I requirements." <u>Cent. Laborers' Pension Fund</u>, 541 U.S. at 746. "The result was
a 'curious duplicate structure' with nearly verbatim replication in the Internal
Revenue Code of whole sections of text from Title I of ERISA." <u>Id.</u> "The anti-
cutback rule of ERISA § 204(g) is one such section, showing up in substantially
identical form as 26 U.S.C. § 411(d)(6)." <u>Id.</u> "This duplication explains the
provision of the Reorganization Plan No. 4 of 1978, § 101, 43 Fed. Reg. 47713
(1978), 92 Stat. 3790, giving the Secretary of the Treasury the ultimate authority
to interpret these overlapping anti-cutback provisions." <u>Id.</u> at 746-47.

19

26 C.F.R. §§ 1.411(d)-3(g)(6)(iv) (2008). In turn, the Secretary of the Treasury, in the same post-Steiner regulation, has defined the phrase "retirement-type benefit" to mean "(A) [t]he payment of a distribution alternative with respect to an accrued benefit; or (B) [t]he payment of any other benefit under a defined benefit plan . . . that is permitted to be in a qualified pension plan, continues after retirement, and is not an ancillary benefit." 26 C.F.R. § 1.411(d)-3(g)(6)(iii). Lastly, the phrase "defined benefit plan" is defined under ERISA to mean "a pension plan other than an individual account plan . . . ." 29 U.S.C. § 1002(35).

Notably, the district court expressly acknowledged this post-Steiner regulatory definition of "retirement-type subsidy" in its order granting summary judgment in favor of defendants. After quoting the regulatory definition, the district court noted that the plaintiffs had "include[d] the . . . definition in a footnote, but d[id] not explain how it applie[d] to the facts of this case." App. at 1209 (citing Response, at 20 n.13). The district court ultimately concluded that "[t]he plaintiffs' argument [wa]s conclusory and inadequately developed." Id. More specifically, the district court concluded that plaintiffs had "fail[ed] to provide any evidence to demonstrate that the Pensioner Death Benefit fits into the Department of Treasury's definition (or any other definition) of a retirement-type subsidy, and in particular they fail[ed] to create a material fact dispute regarding whether the Pensioner Death Benefit [wa]s a retirement-type subsidy subject to ERISA's anti-cutback provision." Id.

Although plaintiffs continue to cite the post-<u>Steiner</u> regulatory definition of "retirement-type subsidy" in their opening appellate brief, they have again failed to provide any substantive explanation as to why the Pensioner Death Benefit fits within this regulatory definition. Instead, they simply assert, in conclusory fashion, that this "clarifying definition should be applied to the facts of this case" and the DLS Equivalent "declared to be a bona fide retirement-type subsidy." Aplt. Br. at 29. We therefore reject, as inadequately briefed, plaintiffs' argument that the DLS Equivalent constitutes a "retirement-type subsidy." <u>See generally</u> <u>Gross v. Burggraf Constr. Co.</u>, 53 F.3d 1531, 1547 (10th Cir. 1995) (holding that issues not adequately briefed will not be considered on appeal).

Even if we were to overlook the shortcomings in the plaintiffs' appellate brief, we would readily conclude that the DLS Equivalent does not constitute a "retirement-type subsidy" for purposes of ERISA's anti-cutback provision. To begin with, nothing in the Treasury's post-<u>Steiner</u> definitional regulation undercuts, and indeed could not undercut, the relevant legislative history of the anti-cutback provision cited in <u>Steiner</u>, which clearly suggests that the term "subsidy" was intended to refer to benefits that continue over a period of time following retirement. In other words, the holding in <u>Steiner</u> that lump sum payments do not qualify as a "retirement-type subsidy" remains valid, notwithstanding promulgation of the Treasury's definitional regulation. And, applying <u>Steiner</u>'s holding to the facts of this case, it is indisputable that the DLS

21

Equivalent does not continue over a period of time following retirement, but rather is a one-time payment.

Further, the DLS Equivalent does not fall within the Treasury's definition of "retirement-type subsidy" because it does not qualify as a "retirement-type benefit." Although the DLS Equivalent could arguably be called a "distribution alternative" to the normal method of payment of the Pensioner Death Benefit, the Pensioner Death Benefit itself does not qualify as an "accrued benefit" under ERISA. At the time the DLS Equivalent was created (in 1997), the 1993 Pension Plan (the plan then in place) expressly defined the term "accrued benefit" to exclude any death benefits, including the DLS Equivalent. Thus, a person reading the 1993 Plan, as amended in 1997, could not reasonably conclude that the DLS Equivalent "relate[d] to an accrued benefit by paying out an accumulated amount of accrued benefits." In re Lucent, 541 F.3d 250, 255 (3d Cir. 2008). Moreover, as the term "accrued" itself suggests, "[a]n accrued benefit" under ERISA "represents the interest in a retirement benefit that a participant earns each year . . . ." Ashenbaugh v. Crucible Inc., 1975 Salaried Ret. Plan, 854 F.2d 1516, 1524 (3d Cir. 1988) (quotation omitted). In this case, it is undisputed that neither the Pensioner Death Benefit in general, nor the DLS Equivalent in particular, "accrue" in any fashion with an employee's years of service. Thus, neither can reasonably be deemed an "accrued benefit" for purposes of ERISA.

*2) Early Retirement Benefit?*

22

Plaintiffs argue, in the alternative, that the DLS Equivalent constitutes an "early retirement benefit" under the anti-cutback provision.[6] ERISA does not contain a definition of the phrase "early retirement benefit." Instead, "Congress contemplated that the Treasury Department would promulgate regulations setting forth" a definition of this phrase. Bellas v. CBS, Inc., 221 F.3d 517, 524 (3d Cir. 2000) (citing 29 U.S.C. § 1054(g)(2)(A)). On August 12, 2005, the Secretary of the Treasury promulgated a regulation defining the phrase "early retirement benefit" to mean "the right, under the terms of a plan, to commence distribution of a retirement-type benefit at a particular date after severance from employment with the employer and before normal retirement age." 26 C.F.R. § 1.411(d)-3(g)(6)(i) (2008). As previously noted, that same regulation, in turn, defined the phrase "retirement-type benefit" to mean "(A) [t]he payment of a distribution alternative with respect to an accrued benefit; or (B) [t]he payment of any other benefit under a defined benefit plan . . . that is permitted to be in a qualified pension plan, continues after retirement, and is not an ancillary benefit." 26 C.F.R. § 1.411(d)-3(g)(6)(iii). Lastly, the phrase "defined benefit plan" is defined under ERISA to mean "a pension plan other than an individual account plan . . . ." 29 U.S.C. § 1002(35).

---

[6] Because plaintiffs do not appear to have asserted this argument below, we have chosen to analyze it on the merits only because it is clearly lacking in merit. See Wilburn v. Mid-South Health Dev., Inc., 343 F.3d 1274, 1280 (10th Cir. 2003) ("An issue is waived if it was not raised below in the district court.").

Although the DLS Equivalent, by its express terms, was payable to certain management employees at the time of their retirement, it otherwise does not fall within the Treasury's definition of the term "early retirement benefit." In particular, for the reasons discussed above in the analysis of plaintiffs' argument that the DLS Equivalent qualifies as a "retirement-type subsidy, it is clear that the DLS Equivalent does not qualify as a "retirement-type benefit," and thus, in turn, cannot qualify as an "early retirement benefit."[7]

*Was the Pensioner Death Benefit Contractually Vested?*

Plaintiffs next contend, in challenging the district court's grant of summary judgment, that even if Amendment 2003-5 did not violate ERISA's anti-cutback rule, it violated the terms of the Plan's reservation of rights clause, which they contend effectively served as a "private anti-cutback clause." Aplt. Br. at 4. In support of this contention, plaintiffs note that the reservation of rights clause prohibited any amendments to the Plan that served to "'diminish the accrued benefit (as defined in Section 411(d)(6) of the Code) of any Participant as of the effective date of such amendment,'" Id. at 34-35 (quoting App. at 607), and they argue that the DLS Equivalent was an "accrued benefit" that was not only diminished, but indeed eliminated, by Amendment 2003-5.

---

[7] It is useful to note, for purposes of this analysis, that under ERISA, a plan (or, more precisely, an "employee benefit plan") may be an "employee welfare benefit plan," an "employee benefit pension plan," or both. 29 U.S.C. § 1002(3). Thus, even though the Plan in this case is referred to as a pension plan, it can, for purposes of ERISA, include both pension and welfare benefits.

We readily reject plaintiffs' arguments. As the above-quoted language from the Plan indicates, the phrase "accrued benefit," as employed in the Plan's reservation of rights clause, carries the same meaning as "in Section 411(d)(6) of the [Internal Revenue] Code." Section 411(d)(6) of the IRC, 26 U.S.C. § 411(d)(6), is the IRC's duplicate version of ERISA's anti-cutback rule. See Cent. Laborers' Pension Fund, 541 U.S. at 746 (noting that ERISA and the IRC have "a curious duplicate structure" with regard to their provisions regarding employee pension plans) (internal quotations omitted). And, as discussed in substantial detail above, it is clear that neither the Petitioner Death Benefit, nor its DLS Equivalent component, qualify as "accrued benefits" under ERISA and the relevant Treasury regulations. Thus, for those same reasons, the DLS Equivalent cannot qualify as an "accrued benefit" under the Plan's reservation of rights clause.

Plaintiffs also make passing references that could perhaps be generously construed as asserting that the Pensioner Death Benefit and/or the DLS Equivalent were welfare benefits that were contractually vested for other reasons and thus protected from being reduced or eliminated. E.g., Aplt. Br. at 37 ("Even if the PDB is a welfare benefit, it was inseparably tied to the formula for the protected early retirement benefit."), 38-39 ("[S]ince the single sum benefit with the DLS Equivalent of the Death Benefit is a protected benefit which causes the PDB to be a protected benefit, due to the IRC Section 420 transfers there should

25

be a declaration identifying Plan participants for whom the benefits are fully vested."). Notably, however, plaintiffs fail to flesh out these arguments sufficiently to create genuine issues for purposes of appeal. Moreover, the district court rejected the notion that the Pensioner Death Benefit had contractually vested, and plaintiffs have made no attempt to challenge any of the particular bases for the district court's conclusion in that regard.

*Dismissal of Kerber and Phelps from Count Two for Lack of Standing*

In their second issue on appeal, plaintiffs contend the district court erred in dismissing plaintiffs Kerber and Phelps from Count Two of the second amended complaint "on the basis that 'each retired in 1990, and the Complaint does not allege that they have suffered any concrete, particularized, and actual injury from the implementation of Amendment 2003-5.'" Id. at 39 (quoting App. at 396-97). According to plaintiffs, "Section 502(a)(3) of ERISA," 29 U.S.C. § 1132(a)(3), "provides a cause of action to any participant or beneficiary" "to seek equitable relief." Aplt. Br. at 40. "Because . . . Kerber and Phelps sought injunctive relief to redress violations of the Plan's terms and violations of the statute," plaintiffs argue, "they have both Article III constitutional and ERISA Section 502(a)(3) statutory standing to pursue Count [Two]." Id. Lastly, plaintiffs argue that Kerber and Phelps "need not demonstrate actual harm in order to have standing to seek injunctive relief requiring a defendant to satisfy statutorily-created responsibilities." Id.

26

We summarily reject plaintiffs' arguments and conclude, for the reasons aptly stated by the district court, that Kerber and Phelps lacked standing to seek relief under Count Two of the second amended complaint.

*District Court's Rejection of Plaintiffs' Extra-Plan Evidence*

Plaintiffs next contend that the district court, in addressing Counts One, Two and Three of the second amended complaint, erred in concluding that a welfare benefit can vest for purposes of ERISA only based upon clear and express language in the relevant Plan documents, and in turn rejecting the extra-Plan evidence presented by plaintiffs in order to establish that the Plan sponsors intended for the Pensioner Death Benefit to vest. More specifically, plaintiffs complain that the district court "gave no weight to [their] evidence showing former Plan sponsor U S WEST's conduct and treatment of the [Petitioner Death Benefit] reflecting an intent to vest the [Petitioner Death Benefit]." Id. at 42. "[T]he most significant evidence" in this regard, plaintiffs assert, "is that former Plan sponsor U S WEST made the [Pensioner Death Benefit] an[] integral part of the early retirement singe [sic] sum payment." Id. In other words, plaintiffs argue, "[t]he formula U S WEST chose for calculating the total amount of the single sum payment proves U S WEST considered the [Pensioner Death Benefit] to be vested and an essential element of the normal retirement benefit." Id.

In determining whether a welfare benefit offered under an ERISA-governed plan has vested, "[t]he question of what 'other evidence' is admissible turns on

27

the relative ambiguity of the plan provision being construed . . . .” Halbach v.

Great-West Life & Annuity Ins. Co., 561 F.3d 872, 877 (8th Cir. 2009). If

neither the specific provision at issue, nor the plan as a whole, resolve the vesting

issue, then it is proper for a reviewing court to consider extrinsic evidence to

assist it in resolving the issue. Id. at 878.

In this case, plaintiffs have failed to identify any ambiguities in the Plan

with regard to the purported vesting of the Pensioner Death Benefit or its DLS

Equivalent component. Further, in our view, the Plan clearly indicated that the

Pensioner Death Benefit as a whole, including the DLS Equivalent, was not

considered to be an “accrued benefit” under the Plan. As for the “formula”

selected by U.S. West in the Plan for calculating the DLS Equivalent, plaintiffs

have failed to explain precisely how that demonstrated U.S. West’s “intent” for

the DLS Equivalent to vest. Thus, we conclude the district court properly refused

to consider the extrinsic evidence offered by plaintiffs regarding U.S. West’s

purported intent.

Plaintiffs also mention, in passing, a “July 1989 version SPD given to . . .

Kerber and Phelps upon retirement” that, according to plaintiffs, “contained a

ROR [reservation of rights clause] but [wa]s limited to the right to terminate the

pension plan” and “sa[id] nothing about any right to cut-back benefits after

retirement.” Aplt. Br. at 44. Although plaintiffs do not flesh out their argument

any further, they appear to be implying that the language in this SPD somehow

28

conflicted with the Plan. See Chiles, 95 F.3d at 1518 ("Because the SPD is such an important vehicle in ERISA's attempt to fairly regulate employment benefits, courts have held that the terms of the master plan cannot control an SPD's provision that is ambiguous or in conflict with the master plan document."). The obvious problem with plaintiffs' argument in this regard, however, is that Amendment 2003-5 did not "cut-back benefits after retirement," but instead limited the Pensioner Death Benefit to employees retiring on or before a certain date. Thus, as the district court correctly noted, Amendment 2003-5 had no impact on plaintiffs Kerber and Phelps. Moreover, as the district court noted in its order granting summary judgment, that very same SPD contained language stating that it was "an overview of the plan," and that "[d]etailed provisions of the Plan [we]re contained in the official Plan text, which govern[ed] in all cases." App. at 1213. Thus, as the district court correctly concluded, there was no conflict between the SPD and the Plan.

Lastly, plaintiffs mention, again in passing, "the priority given to payment of [Pensioner Death Benefits] by the Plan's rules applicable upon termination of the Plan." Aplt. Br. at 47. Plaintiffs argue that these rules, by specifying "that [Pensioner Death Benefit] payments are to receive priority over payment of certain deferred vested pensions," "is strong evidence of intent to vest the [Pensioner Death Benefit]." Id. at 48. As noted by the district court, however, these provisions regarding prioritization of benefits upon termination of the Plan

29

did not result in the vesting of any rights, including the Pensioner Death Benefit, nor do they otherwise create an ambiguity in the Plan where none otherwise existed.

*District Court's Grant of Summary Judgment - Count One*

In their fourth issue on appeal, plaintiffs contend the district court erred in granting summary judgment in favor of defendants with respect to the breach of fiduciary duty claim and the equitable estoppel claim contained within Count One of the second amended complaint. According to plaintiffs, when Kerber and Phelps "retired and chose the structure of benefits to be received for themselves and their spouses, they specifically and detrimentally relied upon representations and assurances about the" Pensioner Death Benefit. Id. at 49. Further, plaintiffs assert "[t]here was no notice given to . . . Kerber and Phelps that any benefits, including the [Pensioner Death Benefit], could be reduced or eliminated." Id. at 50. In particular, plaintiffs assert that the SPDs provided to Kerber and Phelps at the time of their retirement "did not disclose any reserved right to change, reduce or eliminate any benefits, including the" Pensioner Death Benefit. Id. Plaintiffs argue that "the District Court failed to factor the SPD's role in influencing the retirement decisions made by . . . Kerber and Phelps." Id. at 50. Further, plaintiffs argue that these "facts cry out for application of the principles of equitable estoppel, compelling a judicial determination that Plan sponsor Qwest should be estopped from reducing or eliminating the [Pensioner Death Benefit]

30

promised to" Kerber and Phelps. Id. at 51.

Plaintiffs' arguments lack merit for several reasons. First, it is uncontroverted that plaintiffs Kerber and Phelps retired in 1990, over thirteen years prior to the implementation of Amendment 2003-5. Further, by its express terms, Amendment 2003-5 has no impact on these two plaintiffs. Thus, neither of these plaintiffs can establish that they relied to their detriment upon any representations of defendants regarding the Pensioner Death Benefit. Moreover, according to the Supreme Court's decision in Hughes Aircraft, defendants cannot be deemed to have been acting as fiduciaries when they altered the Plan via Amendment 2003-5. 525 U.S. at 443. Thus, it is unclear what basis could exist to support the plaintiffs' purported breach of fiduciary claim.

*District Court's Grant of Summary Judgment - Count Four*

In Count Four of their second amended complaint, plaintiffs sought, in pertinent part, "an order requiring [defendants] to correct the . . . faulty language in the . . . SPD and issue a corrected SPD with language disclosing the Pension[er] Death Benefit [wa]s a vested, protected or accrued defined pension benefit, not subject to reduction or elimination absent a PLAN termination." App. at 66-67. The district court granted summary judgment in favor of defendants with respect to Count Four on the grounds that it was "redundant of Claims One and Two." Id. at 1219. Plaintiffs now argue in their fifth and final argument on appeal that, should they "prevail with either of their claims within

31

Counts I-III that the [Pensioner Death Benefit] became vested or a protected benefit or that . . . Amendment 2003-5 illegally either cutback a retirement-type subsidy or an early retirement benefit," then "the summary judgment order also dismissing Count [Four] should be reversed." Aplt. Br. at 55. In addition, plaintiffs assert that their "motion for class certification which was dismissed as moot will need to be revisited." Id.

For the reasons outlined above, we conclude the district court properly granted summary judgment in favor of defendants with respect to the claims asserted in Counts One through Three of the plaintiffs' second amended complaint. Thus, there is no need to reverse the district court's grant of summary judgment with respect to Count Four, nor is there a need to revisit its dismissal of plaintiffs' motion for class certification.

The judgment of the district court is AFFIRMED.

08-1387, *Kerber v. Qwest Pension Plan*.

**McCONNELL,** J., concurring.

I respectfully concur in the result and join the majority's opinion in full, with the exception of its conclusion that a lump-sum benefit can never constitute a retirement-type subsidy under ERISA. *See* Op. 18–21 (relying on *Steiner Corp. Retirement Plan v. Johnson & Higgins of Cal.*, 31 F.3d 935 (10th Cir. 1994)). The court finds that *Steiner Corp.* remains good law, notwithstanding a subsequent regulation adopted by the Treasury Department defining a retirement-type subsidy simply as "the excess, if any, of the actuarial present value of a retirement-type benefit over the actuarial present value of the accrued benefit commencing at normal retirement age or at actual commencement date, if later . . . ." 26 C.F.R. § 1.411(d)-3(g)(6)(iv). Because I think the Treasury Department's regulation puts into question the continuing validity of *Steiner Corp.*, I would not resolve the question of whether the PDB-Equivalent constitutes a retirement-type subsidy on this ground.

Instead, I would find that the PDB-Equivalent cannot be a retirement-type subsidy for the simple reason that a death benefit is a welfare benefit rather than a retirement benefit, regardless of its mechanism of distribution. *See* 29 U.S.C. § 1002(1)(A) (listing death benefits as an aspect of a "welfare" plan rather than a pension plan); *In re Lucent Death Benefits ERISA Litigation*, 541 F.3d 250, 255–56 (finding pensioner death benefit to be a welfare benefit); *Ross v. Pension Plan for Hourly Employees of SKF Industries, Inc.*, 847 F.2d 329, 333–34 (6th

Cir. 1988) (quoting S. Rep. No. 575, 98th Cong., 2d Sess. 30, reprinted in 1984 U.S. Code Cong. & Admin. News 2547, 2576) ("The committee expects, however, that . . . a death benefit . . . will not be considered a retirement-type subsidy"). ERISA's anti-cutback provision does not apply to welfare benefits. 29 U.S.C. §1051(1); *see Robinson v. Sheet Metal Workers' National Pension Fund, Plan A*, 515 F.3d 93, 98 (2d Cir. 2008). Because a death benefit is a welfare benefit, it does not matter whether it is paid in installments or as a lump sum; either way, it is not subject to ERISA's anti-cutback requirement.

In all other respects, I agree with the majority.