FILED
United States Court of Appeals
Tenth Circuit

October 20, 2010

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

THOM DEFRANCO,

     Plaintiff-Appellant,

v.

STORAGE TECHNOLOGY
CORPORATION; STORAGETEK
INTERNATIONAL SERVICES
CORPORATION; SUN
MICROSYSTEMS, INC.,

     Defendants-Appellees.

No. 08-1095

Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:06-CV-02500-ZLW-MJW)

John R. Olsen of Olsen & Brown, L.L.C., Niwot, Colorado, for Plaintiff-Appellant.

Daniel E. Friesen of Hale Friesen, LLP, Denver, Colorado (Shannon M. Henderson, Peter J. Krumholz with him on the brief), for Defendants-Appellees.

Before **MURPHY, EBEL,** and **HARTZ,** Circuit Judges.

**EBEL**, Circuit Judge.

Plaintiff-Appellant Thom DeFranco was an employee of Defendant-Appellee Storage Technology Corporation ("StorageTek") in Colorado when he agreed to accept an overseas assignment in 2004. Before accepting the two-year job overseas, however, he received verbal assurances from three different StorageTek employees that he would have a "permanent job" when he returned from his work in the United Kingdom. After receiving those assurances, he signed a "Secondment Agreement" with Defendant-Appellee StorageTek International Services Corporation ("StorageTek International"), providing, among other things, that his employment with the company was strictly at will.

In 2005, Defendant-Appellee Sun Microsystems, Inc. ("Sun") acquired StorageTek and spent most of 2005 and 2006 integrating StorageTek into Sun's organization. DeFranco claims that he received two promises from Sun employees—one while he was still abroad, the other after he had returned to Colorado—that he would have permanent employment at Sun. However, in October 2006, he was subjected to a reduction in force and terminated from Sun.

DeFranco brought this lawsuit, claiming breach of contract and promissory estoppel. The district court granted summary judgment in favor of all Defendants. We possess jurisdiction pursuant to 28 U.S.C. § 1291, and affirm.

## I. Background

Viewing the evidence in the light most favorable to DeFranco, as the non-moving party, see Kerber v. Qwest Pension Plan, 572 F.3d 1135, 1144 (10th Cir. 2009), the

2

evidence in the record establishes the following:

### A. DeFranco's initial written employment contract with StorageTek

StorageTek hired DeFranco in 2002 as a project manager. At that time, the company sent him a letter stating the terms of his employment, which DeFranco signed. Among other things, that letter stated:

> Your employment with Storage Tek will be "at-will." This means that either you or Storage Tek may terminate your employment at any time, with or without cause, with or without notice, and for any reason or no reason. Any contrary representations or agreements, which may have been made to you are superseded by this offer. The "at-will" nature of your employment described in this offer letter shall constitute the entire agreement between you and Storage Tek concerning the nature and duration of your employment.

(Aplt. App. at 203.)

### B. DeFranco accepts a position in England

In 2004, DeFranco agreed to accept a position in England with a StorageTek affiliate, StorageTek UK. DeFranco viewed the position as a promotion, and it included a 15% increase in salary. According to DeFranco, his primary concern in weighing whether or not to accept this position and move his family from Colorado to England was whether he would have a job with StorageTek when his assignment in England ended. In response to these concerns, DeFranco claims that three StorageTek executives "guaranteed" that he would have a position at StorageTek when he returned from England: Pat Martin, chairman and chief executive officer ("I have to give you a job when you come back"), Angel Garcia, executive vice president (promised DeFranco he

3

would "be taken care of"), and Roger Gaston, executive vice president of human resources ("I have a requirement to place you when you come back"). These guarantees were made in June and August of 2004.

In September 2004, DeFranco signed a written "Secondment Agreement" with Storagetek International for services DeFranco agreed to provide StorageTek UK.[1] As relevant to the present dispute, the Secondment Agreement contained three important provisions. First, the Secondment Agreement provided that DeFranco's employment was at will:

> You and Company [defined by the Agreement as Storagetek International] each acknowledge that either party has the right to terminate your employment with Company at any time for any reason whatsoever, with or without notice or Cause, as defined in Section 11 below of this Secondment Agreement, or with or without advance notice. This at-will employment relationship cannot be changed except in a writing signed by an authorized representative of Company. It is understood and agreed by you and Company that this Secondment Agreement does not contain any promise or representation that alters your at-will employment status. In addition, any terms of your employment contained in this Secondment Agreement or in any other agreement between you and Company stated in units of years, months, and/or days does not mean and should not be interpreted to mean that you are guaranteed employment to the end of any period of time or for any period of time. In the event that Company terminates your employment for reasons other than Cause, you will be eligible to receive severance benefits (based on your completed years of service as of your employment termination date) in exchange for a signed Company legal release agreement.

(Id. at 207.)

---

[1] The term "secondment" means "the detachment of a person . . . from his regular organization for temporary assignment elsewhere." Webster's Third New Int'l Dictionary 2051 (1986).

4

Next, the Secondment Agreement specifically addressed DeFranco's possible job opportunities with StorageTek when he returned to the United States after his work in England ended:

It is anticipated that the Term [of the Secondment Agreement] will end September 10, 2006 . . . . Upon the end of the Term, Company [StorageTek International] <u>will make reasonable efforts as determined by the Company to return you to a position within Company, StorageTek, or a StorageTek Affiliate</u> [defined by the Agreement as "any subsidiary of StorageTek and any entity controlled directly or indirectly by or under common control of StorageTek"] which is defined by Company as a position similar in duties, scope, and compensation ("Comparable Position") to either the position which you held immediately preceding the secondment or the secondment position. <u>It is understood that Company cannot guarantee that it will be able to return you to a comparable position,</u> and that the selection of the position to be offered will be dependent upon your qualifications, business conditions, and the staffing requirements of Company, StorageTek, and the StorageTek Affiliates.

In the event that within sixty (60) days prior to September 10, 2006 you are offered a Comparable Position, and you decide to decline the offer, your employment will be terminated by Company for reasons other than Cause and you will not be eligible to receive the severance benefits described in Section 3 above. In [the] event that there is no Comparable Position available and offered to you, your employment will be terminated for reasons other than Cause by Company and you will be eligible to receive the severance benefits described in Section 3 above. You may elect to accept a position that is not Comparable (if one is available and offered to you) however, should you decide not to accept this position offered to you, your employment will be terminated by Company for reasons other than Cause and you will be eligible to receive the severance benefits described in Section 3 above. For purposes of this Secondment Agreement, "Cause" is defined in Section 11 below.

(<u>Id.</u> at 209 (emphasis added).)

Finally, the Secondment Agreement contained an integration and no-oral-modification clause.

5

The terms and conditions in this Secondment Agreement . . . , the documents identified in Section 22 hereinabove [regarding a separate "Proprietary Rights Agreement"], and the StorageTek UK, Company [StorageTek International], and StorageTek policies and Plan documents referenced in this Secondment Agreement embody the entire agreement and understanding of the parties hereto with respect to the matters hereinabove and <u>supersedes, terminates, and otherwise renders null and void any and all prior agreements or contracts, whether written or oral, entered into between you and Company or between you and StorageTek or between you and any other StorageTek Affiliate with respect to the matters hereinabove expressly set forth.</u> No amendment or modification of this Secondment Agreement will be valid unless set forth in writing referencing this Secondment Agreement and signed by authorized representatives of both parties. You hereby acknowledge and agree that all prior contractual obligations of Company, StorageTek, and all other StorageTek Affiliates have been fulfilled or are fully incorporated herein.

(Id. at 214-15 (emphasis added).)

The record does not clearly set forth the actual relationship between StorageTek, StorageTek International, and StorageTek UK. Although the Secondment Agreement was only between DeFranco and StorageTek International, on behalf of StorageTek UK, the Agreement, as quoted above, does clearly purport to affect StorageTek's substantive rights as well. For example, the Agreement specifies "that all prior contractual obligations of Company, StorageTek, and all other StorageTek Affiliates have been fulfilled or are fully incorporated herein," and the Agreement "supersedes, terminates, and otherwise renders null and void any and all prior agreements or contracts, whether written or oral, entered into between you and . . . StorageTek." (Id.)

### C. Sun acquires StorageTek

On August 31, 2005, while DeFranco was in England, Sun acquired StorageTek.

6

StorageTek and Sun agreed to a merger effective as of January 1, 2007, and provided that Sun would "assume all of StorageTek's liabilities and obligations." (Id. at 485.)

A great deal of integration between the companies occurred before the merger was officially consummated, however. As part of the merger transition process, Sun, in December 2005, sent StorageTek employees, including DeFranco, a "Confirmation Letter." The Letter sent to DeFranco provided, among other things, that "We [i.e., Sun] look forward to transitioning you to Sun's plans, programs, and policies. We anticipate that this transition will occur on or about January 1, 2006." (Id. at 242.) In addition, the Letter stated:

> The terms and conditions of this Confirmation Letter, in conjunction with [a previously sent] Sun Welcome Letter, supersede any prior written or oral communications to you concerning the terms of your employment with Sun. The terms and conditions of this Confirmation Letter supersede any commitments or promises that may have been made to you by Storage Technology Corporation ("StorageTek"), or agreements between you and StorageTek regarding your employment with StorageTek, including compensation and benefit matters. Your employment is subject to the terms and conditions contained herein and all other relevant Sun policies and procedures.
>
> . . . .
>
> Your employment with Sun will remain "at will," should not be construed as a contract of employment for any specified period of time, and may be terminated by you or Sun at any time, with or without cause or advance notice. Further, Sun may change your compensation, duties, assignments, responsibilities, reporting structure or location of your position at any time to adjust to the changing needs of the company. The "at will" nature of your employment relationship can only be changed by a written agreement signed by the Sun Vice President of Human Resources and by you.

(Id. at 242-43 (emphasis added).) The Confirmation Letter asked DeFranco to "confirm

7

your agreement by signing and dating" the Letter. (Id. at 243.) But DeFranco refused to sign, because he had concerns about the Letter, specifically that it superseded any previous agreements with StorageTek and because it provided for a smaller bonus than he had previously received.

### D. Sun sends DeFranco back to the United States

Two months later, in February 2006, Sun informed DeFranco that his assignment in England would be ending six months sooner than anticipated. To facilitate changing the Term of the Agreement, DeFranco and StorageTek International (Sun did not sign this agreement) signed an "Amendment" to the Secondment Agreement that provided that the term of that agreement would expire on March 31, 2006. This Amendment also provided for a new set of duties for DeFranco to perform, including "[a]uditing an engineering queue that consists of 9,000 open customer issues to determine which are still valid and need code fixes from engineering. Once current the team will implement ongoing processes to status, manage and drive owner accountability and solutions for customers." (Id. at 244.) According to DeFranco, this particular project was "temporary" in the sense that, when these 9,000 open customer issues were resolved, his project would end. DeFranco began working on this project while he was still in England, and continued working on it after he returned to the United States in April 2006.

DeFranco contends that, after he signed the Amendment to the Secondment Agreement, Sun executives Steve Wendt and Eula Adams verbally "guaranteed" him a permanent job with Sun, though Wendt and Adams deny making such claims. DeFranco

8

claims that he relied on these verbal representations by refraining from looking for another job outside Sun and by spending $30,000 of his own money to keep his family in England through the end of the school year.

### E. Sun terminates DeFranco

Both before and after he returned to the United States, DeFranco attempted to get another position within Sun by networking with Sun management and by applying for jobs posted on Sun's internal website. But DeFranco had no luck. There is a disputed factual question as to what help, if any, Sun employees provided DeFranco in his job search.

Sun originally intended to terminate DeFranco during a reduction-in-force ("RIF") occurring in May 2006, a month after he returned from England. According to his supervisors, DeFranco was not subjected to that RIF in order to give him more time to try to find another position with Sun. In August 2006, however, as part of another RIF, Sun notified DeFranco that his employment would be terminated effective October 3, 2006. Although he was paid through October 3, he did not physically work at Sun after August 3, 2006. DeFranco turned down a severance package because he refused to sign a release of his claims against Sun.

**F. Procedural history**

DeFranco sued StorageTek, StorageTek International, and Sun in Colorado state court, bringing claims for both breach of contract and promissory estoppel. Defendants removed this action to federal court, pursuant to the federal courts' diversity jurisdiction, see 28 U.S.C. § 1332(a).[2] Following discovery, the district court granted Defendants summary judgment on both of DeFranco's claims. In ruling from the bench, the district court held that "the [Secondment] agreement makes clear that all of these [Defendant] entities are considered together"; "the secondment agreement is the sole employment agreement by the parties"; and "the defendants have performed all necessary requirements under the employment agreement relating to plaintiff's repatriation by returning plaintiff to a position in the company similar in duty, scope, and compensation to the secondment position." (Apt. App. at 711-12.) DeFranco now appeals that decision.

## II. Discussion

This court reviews de novo the district court's decision to grant summary judgment, viewing the record in the light most favorable to the non-moving party, DeFranco. See Kerber, 572 F.3d at 1144. In addition, "we may affirm on any grounds supported by the record." Bixler v. Foster, 596 F.3d 751, 760 (10th Cir. 2010).

---

[2] Defendants also relied on the federal courts' federal-question jurisdiction, see 28 U.S.C. § 1331, because DeFranco originally included a Title VII gender discrimination claim in his complaint. DeFranco, however, has since abandoned that federal claim.

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).

The parties agree that Colorado law governs DeFranco's claims. In applying Colorado law, this court is bound to apply Colorado substantive law. Pompa v. Am. Family Mut. Ins. Co., 520 F.3d 1139, 1142 (10th Cir. 2008). When there is no decision of the Colorado Supreme Court that is directly on point, "we must predict how that court would rule." Id.

The essence of DeFranco's claims is that employees of the Defendants made him promises that he would have permanent employment at StorageTek/Sun, and that they broke those promises to him. DeFranco seeks to recover on a breach of contract theory if these promises created a contract, and under a promissory estoppel theory if the promises did not. See, e.g., Marquardt v. Perry, 200 P.3d 1126, 1131 (Colo. Ct. App. 2008) ("In Colorado, promissory estoppel is available as a theory of recovery when breach of contract fails."). In his brief, DeFranco identifies five promises that were made to him that he would have permanent employment upon his return. These promises can be generally grouped into two categories: 1) three promises made by StorageTek employees in the summer of 2004, and 2) two promises made by Sun employees in 2006. We will analyze these two sets of promises in turn.

11

## A. Summer 2004 promises

In June 2004, Angel Garcia, an executive vice president at StorageTek, was trying to convince DeFranco to accept a position overseas. According to DeFranco, Garcia "guaranteed that when I came back, I would have permanent employment." (Apt. App. at 419.) Later that summer, in August, DeFranco received similar assurances from two other StorageTek employees. Pat Martin, the chairman and chief executive officer, "guarantee[d] [DeFranco] a position when [he] returned." (Id. at 421.) Finally, Roger Gaston, executive vice president of human relations, told DeFranco in August that "StorageTek's policy is to guarantee permanent employment when you came [sic] back." (Id. at 422.) These promises, according to DeFranco, were breached when he came back from overseas and was subjected to a RIF within six months of his return.

However, these alleged guarantees were made before DeFranco signed the Secondment Agreement. The agreement, by its own terms, "supersedes, terminates, and otherwise renders null and void any and all prior agreements or contracts, whether written or oral, entered into between you and [StorageTek International] or between you and StorageTek or between you and any other StorageTek Affiliate with respect to the matters hereinabove expressly set forth." (Id. at 214 (emphasis added).) One of the matters "expressly set forth" in the Secondment Agreement was that DeFranco's employment was strictly at will. The Agreement goes on to provide that "[y]ou hereby acknowledge and agree that all prior contractual obligations of . . . StorageTek . . . have

12

been fulfilled or are fully incorporated herein." (Id. at 215.) The Secondment Agreement's at-will provision thus supersedes any guarantees StorageTek employees made to DeFranco prior to his signing the Agreement.

DeFranco argues that the Secondment Agreement does not apply to StorageTek because the only signatories to the Agreement are StorageTek International and DeFranco. This argument is unpersuasive. "[C]ommon law contract principles . . . allow for the formation of contracts without the signatures of the parties bound by them." Yaekle v. Andrews, 195 P.3d 1101, 1107 (Colo. 2008). Here, we need not spend much time considering whether StorageTek International acted with apparent authority to bind StorageTek to the Secondment Agreement, see Villalpando v. Denver Health & Hosp. Auth., 181 P.3d 357, 363 (Colo. Ct. App. 2007) ("Apparent authority is established by proof of written or spoken words or other conduct of the principal which, reasonably interpreted, causes a person to believe that the principal consents to have the act done on his behalf by a person purporting to act for him." (internal quotation marks omitted)), or whether StorageTek was a third-party beneficiary of the Agreement, see E.B. Roberts Constr. Co. v. Concrete Contractors, Inc., 704 P.2d 859, 865 (Colo. 1985) ("A person not a party to an express contract may bring an action on such contract if the parties to the agreement intended to benefit the non-party . . . ."). Either way, on these facts, there can be little doubt that the Secondment Agreement creates enforceable obligations and contractual rights on the part of StorageTek. StorageTek employees asked DeFranco to work for StorageTek UK for a period of time before returning to the United States,

13

suggesting that StorageTek viewed this as an internal move within the overall StorageTek organization, not, as DeFranco would have it, a move to an external company that was largely unaffiliated with StorageTek. (See, e.g., DeFranco Dep., Aplt. App. at 419 ("[Angel Garcia] said that it would mean a lot to StorageTek . . . if I would consider moving out there for a few years." (emphasis added)).) In fact, the very use of the term "secondment" suggests that this was a move within the same organization. See Webster's Third New Int'l Dictionary 2051 (1986) (defining "secondment" as "the detachment of a person . . . from his regular organization for temporary assignment elsewhere" (emphasis added)).

Thus, given the close relationship between StorageTek and StorageTek International, we find DeFranco's claim that "he had no reason to believe that [the Secondment Agreement] automatically negated any oral guarantees he was made by [StorageTek]" unconvincing. (Aplt.'s Br. at 12.) The plain terms of the Agreement purport to bind StorageTek, and given the nature of the relationship between StorageTek and StorageTek International—a relationship of which DeFranco was aware given that it was StorageTek employees who asked him to take the assignment with StorageTek International—the Secondment Agreement applied to StorageTek itself as well as StorageTek International. Therefore, the three promises allegedly made by StorageTek employees before DeFranco signed the Secondment Agreement were superseded by the Agreement and cannot support a cause of action for breach of contract or promissory estoppel.

14

**B. 2006 promises**

DeFranco also argues that Sun employees promised him permanent employment in 2006.[3]  According to DeFranco, in February 2006, while DeFranco was still in the United Kingdom, Steve Wendt of Sun told DeFranco that they had to bring him back to the United States early, and added, "[W]e'll find you a permanent job when you get back."  (Aplt. App. at 424.)  Then, in April, after DeFranco returned to Colorado, Eula Adams "affirmed the guarantee of permanent placement for [DeFranco] in the new organization."  (Id. at 428.)

Prior to these statements, DeFranco was an at-will employee of Sun.  This is either because Sun explicitly provided for at-will employment in the Confirmation Letter it sent to DeFranco in December 2005 or because Sun became a party to the Secondment Agreement (which also provided for at-will employment) at some point during the merger.  We need not definitively resolve whether Sun became party to the Secondment Agreement, however, because either way, DeFranco was an at-will employee.[4]

---

[3] Because DeFranco explicitly alleges that Wendt and Adams were Sun employees and not employees of StorageTek, we conclude that his breach of contract and promissory estoppel claims based on these promises are brought solely against Sun and not the other two Defendants.

[4] Defendants argue that Sun could invoke the Secondment Agreement's provision requiring all modifications to be in writing to bar Wendt's or Adams's statements from modifying the at-will employment outlined in that agreement.  This is wrong, for two reasons.  First, in Colorado, "a subsequent oral agreement between the parties may modify a provision of an earlier written contract, even in the face of a provision in the original contract that modifications must be in writing."  Agritrack, Inc. v. DeJohn

The question, then, is whether Wendt's and Adams's statements altered the at-will employment relationship that existed. "Colorado law presumes the employment relationship to be terminable at will by either party without liability." Jaynes v. Centura Health Corp., 148 P.3d 241, 243 (Colo. Ct. App. 2006). "The employee may, however, rebut the effect of that rule by proving that an explicit term of the employment contract restricts the employer's right to discharge . . . ." Schur v. Storage Tech. Corp., 878 P.2d 51, 53 (Colo. Ct. App. 1994). In addition, "even if the requisites for formation of a contract are not found," DeFranco may rebut the presumption of at-will employment under a promissory estoppel theory. See Continental Air Lines, Inc. v. Keenan, 731 P.2d 708, 712 (Colo. 1987). We will therefore consider whether these 2006 promises can support either DeFranco's breach of contract claim or his promissory estoppel claim against Sun.

Housemoving, Inc., 25 P.3d 1187, 1193 (Colo. 2001) (emphasis added); see also James H. Moore & Assocs. Realty, Inc. v. Arrowhead at Vail, 892 P.2d 367, 372 (Colo. Ct. App. 1994) ("[G]enerally, a written contract may be modified by a later oral agreement . . . even in the face of a specific provision in the written agreement that all modifications must be in writing."). So even if the Secondment Agreement applied to Sun, a subsequent oral agreement could still modify the at-will employment provision of that agreement.

Second, even if the no-oral-modification clause of the Secondment Agreement could be enforced to bar Wendt's guarantee of permanent employment made in February 2006, it would not apply to Adams's statement because his promise, in April, was made after the Secondment Agreement expired on March 31, 2006. Thus, the Secondment Agreement's provision requiring all modifications to be in writing does not impact the ensuing analysis of whether Wendt's and/or Adams's statements created a legally binding promise for permanent employment.

16

### 1. Breach of contract

In his breach of contract claim, DeFranco claims that Wendt's and Adams's statements created a contract for permanent employment. However, "in the absence of special consideration or an express stipulation as to the length of employment, employment for an indefinite term presumptively creates an at-will employment relationship that is terminable at any time by either party." Pickell v. Ariz. Components Co., 931 P.2d 1184, 1186 (Colo. 1997). Colorado courts have held that a contract providing for "permanent employment," such as that alleged by DeFranco here, "is no more than an indefinite general hiring terminable at the will of either party." Pittman v. Larson Distrib. Co., 724 P.2d 1379, 1383 (Colo. Ct. App. 1986). "The rationale for this rule is that, if the employee gives to the employer consideration beyond that derived from his or her services as an employee, the employee has effectively 'purchased' the job and he or she should not be deprived of it easily." Schur, 878 P.2d at 54. Accordingly, unless DeFranco can show that he provided special consideration to Sun in exchange for Sun's alleged promise to provide permanent employment, no enforceable contract providing for anything other than employment at will exists.

"Special consideration" is consideration other than services incident to the employee's employment. Id. Examples of special consideration include "accepting a reduced salary, releasing claims against the employer, or agreeing to purchase property from the employer." Id. DeFranco claims that he provided special consideration by

17

foregoing the opportunity to look for other jobs in 2006. "Relinquishing other employment, however, generally is not alone considered 'special consideration.' Giving up another position is necessary before the employee is in a position to accept and perform the offered employment and is not a price or consideration paid to the new employer." Pickell v. Ariz. Components Co., 902 P.2d 392, 397 (Colo. Ct. App. 1994), rev'd on other grounds by 931 P.2d 1184. If relinquishment of another job does not constitute special consideration, then merely deciding not to look for another job cannot either. In addition, it does not appear from the record that DeFranco's foregoing a job search was bargained for by Sun—or, indeed, that Sun was even aware that DeFranco was considering looking for another job—and therefore it was probably not consideration at all. See Lucht's Concrete Pumping, Inc. v. Horner, 224 P.3d 355, 358 (Colo. Ct. App. 2009) ("Consideration is defined as something (such as an act, a forbearance, or a return promise) bargained for and received by a promisor from a promise; that which motivates a person to do something, especially to engage in a legal act." (alterations and internal quotation marks omitted)), cert. granted on other grounds, 2010 WL 341383 (Colo. Feb. 1, 2010) (No. 09SC627).

DeFranco also contends that agreeing to stay on to facilitate the merger and staying to finish the 9,000 cases mentioned in the Amendment to the Secondment Agreement constituted special consideration. We fail to see how these actions were anything other than services incident to his employment. See Schur, 878 P.2d at 54. Remaining with the company is just another way of saying that DeFranco accepted Sun's

offer of employment, and his agreeing to finish the 9,000 cases was also just agreeing to

do the task that the company set for him. Refusing to perform either of these tasks would

have been refusing to do his job duties, and so they do not constitute special

consideration. (See Amendment to Secondment Agreement, Aplt. App. at 244 (defining

DeFranco's job to include "[a]uditing an engineering queue that consists of 9,000 open

customer issues").) Thus, DeFranco did not provide special consideration in exchange

for Sun's alleged promise of permanent employment, and so his employment continued

to be at will. DeFranco's breach of contract claim against Sun must therefore fail.[5]

### 2. Promissory estoppel

Although we conclude that no valid contract providing for "permanent"

employment existed between DeFranco and Sun, DeFranco's promissory estoppel claim

---

[5] To the extent DeFranco also means to bring a breach of contract claim on the ground
that Defendants did not provide him with a "Comparable Position" as required by the
Secondment Agreement, such a claim must also fail. The Secondment Agreement
provides:

> Upon the end of the Term, <u>Company will make reasonable efforts</u> as
> determined by the Company <u>to return you to a position within Company,
> StorageTek, or a StorageTek Affiliate</u> which is defined by Company as a
> position similar in duties, scope, and compensation ("Comparable
> Position") to either the position which you held immediately preceding the
> secondment or <u>the secondment position</u>.

(Aplt. App. at 209 (emphasis added).) The Amendment to the Secondment Agreement
defined DeFranco's job as "Tech Support Manager 3, E11," which included, among other
tasks, "[a]uditing an engineering queue that consists of 9,000 open customer issues." (Id.
at 244.) In his deposition, DeFranco admitted that when he returned to Colorado in April
2006—after the end of the term of the Secondment Agreement—he continued to work in
the same role performing the same tasks. Therefore, Defendants complied with any
obligation they had pursuant to the Secondment Agreement to provide him with a
"Comparable Position" upon his return to Colorado.

may still be viable. See, e.g., Marquardt, 200 P.3d at 1131 ("In Colorado, promissory estoppel is available as a theory of recovery when breach of contract fails."). However, we conclude that this claim must also fail due to a lack of special consideration.

In Pickell v. Arizona Components Co., the Colorado Supreme Court held that "Colorado adheres to the general rule that, in the absence of special consideration or an express stipulation as to the length of employment, employment for an indefinite term presumptively creates an at-will employment relationship that is terminable at any time by either party." 931 P.2d at 1186. One could argue that the special consideration requirement should only apply to breach of contract claims and not promissory estoppel claims like the one we have here, because the general purpose of promissory estoppel is to enforce promises that do not lead to the creation of a contract. See, e.g., Mariani v. Rocky Mountain Hosp. & Med. Serv., 902 P.2d 429, 435 (Colo. Ct. App. 1994) (recognizing that promissory estoppel claim could be brought "even though the elements of a formal contract were lacking"). Nevertheless, we believe that Pickell forecloses such an argument, because the plaintiff in Pickell brought only a claim for promissory estoppel, and the Colorado Supreme Court still determined that the requirement of "special consideration or an express stipulation as to the length of employment" applied to that claim. See Pickell, 931 P.2d at 1186. If that requirement does not apply to promissory estoppel claims, there would simply be no reason for the Pickell court to even mention it. Thus, consistent with our obligation to predict how the Colorado Supreme Court would resolve this issue, see Pompa, 520 F.3d at 1142, we must conclude that since

20

DeFranco did not provide any special consideration or express stipulation as to the length of employment, the district court properly entered summary judgment on DeFranco's promissory estoppel claim.

**III. Conclusion**

For the foregoing reasons we AFFIRM the district court's grant of summary judgment. Appellees' motion to file a supplemental brief is DENIED.